# UNITED STATES DISTRICT COURT
# F'OR THE MIDDLE DISTRICT OF PENNSLVANIA

UNITED STATES OF AMERICA  :  NO. 1:15-CR-309

(CHIEF JUDGE CONNER)

v.  :

JALIL IBN AMEER AZIZ,  :  (electronically filed)
Defendant.

## DEFENDANT'S SENTENCING MEMORANDUM

On January 27, 2017, Mr. Jalil Aziz entered guilty pleas to one count of Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization, in violation of Title 18, United States Code, § 2339B(a)(1) and one count of Transmitting a Communication Containing a Threat to Injure, in violation of Title 18, United States Code, § 875(c).

Mr. Aziz respectfully submits this Memorandum in Aid of sentencing and requests that a number of factors warrant a variance from the Advisory Guidelines System under 18 U.S.C. § 3553(a), specifically the disparity between his own conduct and the conduct and prior sentences handed down against defendants charged with the identical offense, far more involved and certainly more dangerous than Mr. Aziz, his own history and characteristics, his acceptance of responsibility, his low risk of recidivism, and his exceptional opportunity for rehabilitation. Given the applicability of the 3553 factors in this case, counsel respectfully submits that the Court sentence him at base offense level twenty-four, which carries a suggested guidance range

1

of 51-63 months, as the appropriate punishment in this case. This sentence will prevent Mr. Aziz from being classified and convicted with seasoned, much older defendants, convicted of Acts of Violence. That surrounding will not lead to the Commencement of Rehabilitation. Lastly, counsel would request that, if it imposes the requested sentence, the Court includes a Statement of Reasons so the Bengal of Prisons does not make its best educated guess concerning Mr. Aziz's destination. If the Court sentences Mr. Aziz to anywhere near the suggested guideline sentence, Mr. Aziz will be destined for a penitentiary, a prison housing inmates who are much older and seasoned, many of whom are mentally ill and most of whom doing sentences in excess of 25 years. This is because BOP placement will be determined by his conviction of terrorism, despite having never gone overseas, and a criminal history category VI, notwithstanding having never been arrested before. Those two factors alone will result in a designation that will surround Mr. Aziz with criminals/sociopaths that will make his future rehabilitation that much longer. In addition, Mr. Aziz will be unnecessarily punished because of his age, which will raise his score, and at 5'2" tall and 160 pounds, Mr. Aziz will be an easy target. Consequently, counsel would respectfully request that the Court recommend FCI Cumberland, Maryland. Cumberland has psychological services and can offer vocational training to Mr. Aziz.

In addition, the interests of justice would be particularly served if Mr. Aziz is committed to a facility that is close to his mother, brother and sister. In particular, his brother, Ibrahim Aziz has spent considerable time and resources to secure a job for his brother, vocational training, and therapy upon his release. (*See* letter from Ibrahim Aziz and Shahidah Aziz attached as Exhibits 1 and 1A).

## Factual Background

When Jalil Aziz was seventeen years old, he became trapped in what Department of Justice officials have described as the "radicalization echo chamber," in which every day on the internet several thousands of Americans are exchanging tens of thousands of pieces of ISIS propaganda disengagement and rehabilitation, including 'off ramps' on the path of radicalization to violence." *Assistant Attorney General John P. Carlin Delivers Remarks on Domestic Terrorism at an Event Co-Sponsored by the Southern Poverty Law Center and the George Washington University Center for Cyber and Homeland Security's Program on Extremism, United States Department of Justice (Oct.14, 2015),* available at https://www.justice.gov/opa/speech/assistant-attorney-general-john-p-carlin-delivers-remarks-domestic-terrorism-event-co. The majority is innocent and do not travel or engage in violence. In fact, all of the behaviors that led to Mr. Aziz's guilty pleas in this case related to his participation in this internet echo chamber.  In addition to regularly posting brief comments that were pro-ISIS on his Twitter account, on three occasions, Mr. Aziz responded on the Internet to people who said they were overseas and needed "assistance traveling to fight for ISIL." PSR at 6, ¶10.  In response, Mr. Aziz directed them to readily available public information on the Internet.  On another occasion, Mr. Aziz was one of many people who reposted a "hit list" of American military personnel that had been created by ISIL's leading propagandist and that had gone viral, previously.

While it is true that during this time, many of Mr. Aziz's posts were inappropriate, outrageous, and hateful, it is also true that Mr. Aziz never intended to act on any of his Internet

3

chatter, or endorsement of violence, and it is hard to imagine how he could have acted on any of these fantasies if he had wanted to. Mr. Aziz has not successfully completed a grade in school since the eighth grade. He has always lived in his parents' house in a bedroom that adjoins theirs and shares a bathroom. He has never had a driver's license, a passport, a credit card, nor a bank account. The $500 he does have is kept for him by his mother, PSR at 12, ¶66, and he does not leave the house without his parents' permission.

At the time of Mr. Aziz's arrest, there was no plan for him to travel to foreign nations, nor for any other aspect of his life to change. Mr. Aziz has had asthma since the age of six and requires an inhaler, and he has only been outside of Pennsylvania on those occasions when his family has lived outside the state; specifically, Jalil moved 4 times before he was 15-years-old. PSR at 12, ¶60. Mr. Aziz's Internet fantasies simply offered moments of escape from an incredibly isolated life, and the more outrageous his posts were, the more Internet followers he would experience and the more a part of something he could feel.


Mr. Aziz has a maternal half-sister, Shahida, who is sixteen years older than he is and a maternal half-brother, Ibrahim, who is fourteen years older. PSR at 11, ¶57. Around the time of Mr. Jalil Aziz's birth, Shahida moved out of the family home to live with a friend and then, a year later, moved in with her maternal grandmother. Ibrahim moved out when he was seventeen and Mr. Aziz was three, leaving Mr. Aziz with no siblings. While Shahida and Ibrahim were growing up, their mother insisted that she did not want anyone influencing her children other than herself. The family moved constantly, for no apparent reason, and Shahida and Ibrahim never attended any school for more than two years. At one point, Shahida and Ibrahim attended four schools in four years. Both Shahida and Ibrahim remain estranged from their parents despite

Ibrahim's almost continuous efforts, since his time in counseling, to reconcile. That left Mr. Jalil Aziz home alone, the remaining target of his mother's abuse, indifference, and isolation. One might question how a loving parent could not be aware of the Internet activity of her only child Jalil, who lived in the adjacent bedroom, particularly when Jalil's brother and sister had both moved out around the time they turned 17-years-old because they could not withstand the design of their mother to exercise control over them. Indeed, Ms. Aziz did not allow friends over, did not permit her children to talk on the phone, or participate in social activities in or out of school, or even sporting activities.

After Ibrahim and Shahida had moved out of the house, Mr. Aziz's mother resolved that no one would take her youngest child, Mr. Aziz, from her. During Mr. Aziz's childhood, the family's pattern of constantly moving continued particularly after his mother withdrew him from school after the fourth grade. PSR at 12, ¶63. In fact, in the eight years following Mr. Aziz's withdrawal from school, the family moved five times across four states. PSR at 12, ¶59. Mr. Aziz did not make friends. He had no belief that friendship would last. During these eight years, Mr. Aziz completed only four grades although he was technically being homeschooled, PSR at 12, ¶63, and his mother, who supervised his homeschool program, was a former school principal, strangely enough. PSR at 11, ¶57. Mr. Aziz has never been diagnosed with a learning disability, PSR at 12, ¶61, although in all likelihood he has one since he unsuccessfully attempted to complete the ninth grade over the course of eighteen months, before his mother ultimately removed him. He also has no GED.

5

At seventeen, Mr. Aziz thought he was on the brink of graduating high school when in fact he had not yet completed the ninth grade. When he was arrested at twenty, he was under the impression he had graduated from high school when he had actually made no additional academic progress in the intervening three years. PSR at 12, ¶63. When Mr. Aziz tried to study at home, his mother would constantly demean and berate him and insist that he was stupid. However, during one period, when he was allowed to do his homework at his half-brother Ibrahim's home, Mr. Aziz was able to successfully complete all his homework in a timely manner.

Interaction with either of his half-siblings, however, was the exception rather than the rule, and for the most part, Mr. Aziz grew up isolated from anyone other than his mother. When Mr. Aziz first fell prey to the ISIL propaganda machine, he had not been out of the house to attend a school in seven years, he had no friends, and he had no job. PSR at 12, ¶63. He had no social interaction with any groups that participated in sports, culture, or music. From the age of six until the age of ten, he was so severely bullied in school that he was ultimately removed from school. PSR at 12, ¶63. In his parents' house, he had no access to television, radio, nor newspapers and could only use the house telephone with permission. His use of the family computer had to be under supervision. Mr. Aziz was not allowed to attend movies, but he was allowed to watch YouTube videos on cooking and history with his mother. Mr. Aziz was allowed to read some Islamic books but no secular ones. He could ride his bike in the neighborhood so long as he agreed not to stop to talk with anyone, and he was accountable for every minute of his day.

Mr. Aziz's half-brother Ibrahim is the founder and chief officer of a nonprofit organization that provides a full range of services, including mental health services, to help

6

rehabilitate young people who have been radicalized. Ibrahim remains very devoted to Mr. Aziz, visits and communicates with him frequently, and has already taken steps to create a support network to help Mr. Aziz in his rehabilitation efforts. As a first step in that process, Mr. Jalil Aziz has accepted responsibility for his actions. Mr. Aziz continues to enjoy history and would like someday to become a chef.

Both Shahida and Ibrahim sought to have a relationship with their half-brother although they were largely prevented from doing so. Because Mr. Aziz could not use the house phone, on this mother's orders, to talk with his half-siblings. Shahida, who is a corrections officer in Rikes Island, bought Jalil an iPhone. It was this iPhone that became Mr. Aziz's window into ISIL propaganda, although his sister had no knowledge of this. Unfortunately, as Mr. Aziz increasingly encountered that propaganda at the time, he had neither the educational nor social filters necessary to evaluate it nor appreciate how he was perpetuating trauma and hate. In addition, Mr. Aziz could not ask his parents or his half-siblings for direction for fear of losing the phone, and, thus, his only window to the world outside, and he had no other adults he could go to, notwithstanding his recognition he was wrong.

Although Mr. Aziz on occasion posted pictures he had found on the Internet of guns and equipment, he never actually acquired any of these items. *See, e.g.,* PSR at 6, ¶7(b). In fact, Mr. Aziz was not permitted to go shopping or leave the house without a parent.

Mr. Aziz, however, did have a backpack, which was searched at the time of his arrest. The most ominous item in the backpack was ammunition, which belonged to Mr. Aziz's

father, who had purchased the ammunition while the father was considering buying a gun. PSR at 6, ¶13. The father ultimately decided not to buy a firearm. The remainder of the contents of the backpack were a ski mask, a knife with a broken handle from the family's kitchen, a thumb drive, a tin filled with various over-the-counter-medications, a toothbrush, flashlights, a lighter, fingerless gloves, nail clippers, cording, and a pocket watch, all items that Mr. Aziz had gathered from around the house. PSR at 6, ¶13.

Mr. Aziz never successfully raised money for ISIS. He never attempted to travel so he could join ISIS. He never owned a firearm, nor did he ever train in firearms. Mr. Aziz has never sought military training, nor does he have any professional expertise he could offer any terrorist group beyond his dysfunctional eighth grade education. When victim/restitution information was solicited from the people on the "hit list" of American military personnel that Mr. Aziz had reposted, only seven of 102 responded, only five made a claim for restitution, and not one indicated any awareness of Mr. Aziz's posting in particular.

I.      The Maximum Sentence for a Violation of 18 U.S.C. § 2339B(a)(1) Is Fifteen Years When the Majority of the Acts Committed Occurred Before June 2, 2015, the Date Marking the Passage of the Increase from 15 to 20 Years.

Most of his illegal acts, according to the PSR writer, took place prior to the amendment to the statute 2339B(a)(1), which increased the statutory maximum from fifteen to twenty years (*See PL* 114-23 June 2, 2015). The increase, by congress was intended to lengthen the amount of time defendants who were truly aiding and providing authentic material support, not someone like Mr. Aziz who, although espoused hate, with a broken kitchen knife, and ammunition,

purchased by his father, without a firearm, and never traveled nor intended to do so. As noted in

the Presentencing Report, the *current* statutory maximum sentence for a violation of 18 U.S.C. §

2339B(a)(1) is twenty years. PSR at 13, ¶68 (emphasis added). This maximum sentence was

changed, however, from fifteen years to twenty years on June 2, 2015, by the USA Freedom Act,

Pub. L. 114-23. The defendant, Mr. Jalil Aziz was arrested on December 17, 2015. PSR at 17,

¶14. However, the Government began to monitor his behavior at least by June 29, 2014, and

fourteen of the twenty-one illegal acts described in the Presentencing Report occurred prior to

June 2, 2015. This is further supported by an exhibit the government intended to utilize for trial

illustrating when the acts took place. In addition, in the exhibit the United States prepared for

trial, seventy-four pages appeared to have dates prior to June 2, 2015, while only thirteen contain

dates after June 2, 2015. Counsel respectfully submits, therefore, that the Court should sentence

Mr. Aziz under the pre-June 2, 2015 maximum sentence because the defendant's offense conduct

began and predominantly took place before June 2, 2015.


This precise issue previously arose in the Third Circuit in *United States v. Topaz*, where

the United States Attorney for the District of New Jersey chose not to argue that the twenty-year

sentence applied "in recognition of the fact that Samuel Rahamin Topaz's offense conduct began

and predominantly took place prior to June 2, 2015, and his timely acceptance of responsibility."

*United States v. Topaz*, 2-15-cr-00450-SDW, Plea Agreement with Samuel Rahamin Topaz

(Doc. 14), at 2 (D.N.J. 2015). Both parties, however, agreed that the court could still choose the

post-June 2, 2015 maximum sentence instead, *id*, and Mr. Topaz has yet to be sentenced.

Outside the Third Circuit, in *United States v. Said*, 1:13-cr-20364-UU (S.D.F. 2015), the United

States Attorney for the Southern District of Florida also accepted the pre-June 2, 2015 maximum

sentence, but in that case, he did so because Mr. Said had "been arrested in 2013." *Id.,* Government's Sentencing Memorandum (Doc. 8), at 2. Mr. Said was ultimately sentenced consistent with the pre-June 2, 2015 maximum sentence of fifteen years. *Id.,* Judgment (Doc. 248), at 2.

In *United States v. Washington*, Judge Theodore McKee stressed the importance of the Judiciary's role in overseeing prosecutorial behavior to protect "fairness" and prevent the destruction of "the fundamental relationship between culpability and punishment that is so important to sentencing." *United States v. Washington*, 2017 WL 3695129 28, 31 (3rd Cir.) (McKee, J., concurring in part and dissenting in part). As the Supreme Court, itself, has pointed out, unless the Judicial Branch engages in such oversight to guarantee at least basic protections, "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." Arizona v. Fulminante, 499 U.S. 279, 310 (1991). In fact, as the court pointed out in *United States v. McLean,* "[t]he Sentencing Guidelines themselves recognize the danger of vesting too much discretion in the Government," and, therefore, "empower judges to compensate for law enforcement overreach." 199 F.Supp.3d 926, 928 (E.D. PA 2016).

In *McLean*, the court articulated language that is equally applicable here, that "[t]his is not a criticism of the highly capable, highly professional prosecutor in this case," but is, instead, "an observation about the concentration of power with the prosecution generally." 199 F. Supp. 3d at 941-42. Indeed, all that is indicated here is that when five years of an individual's life comes down to the timing of his arrest, the Judiciary should have an opportunity to consider that

10

timing and its relationship to sentencing, and the Judiciary should be able to do so guided by a rule that provides a fair and meaningful mechanism for review. Courts will have such a rule if they are guided by the position of the United States Attorney for the District of New Jersey that when choosing between maximum sentences for violations of section 2339B, the applicable maximum is determined by when "the offense conduct began and predominantly took place."

As noted earlier, Mr. Aziz's offense conduct began almost a year before the change in the maximum sentence, and it "predominantly took place prior" to the change. Two-thirds of the dated conduct in the Presentencing Report is prior to June 2, 2015, and eighty-five percent of the pages in the Government's exhibit for trial appear to be dated prior to June 2, 2015. In addition, all of the conduct that demonstrates Mr. Aziz communicating "material support' to a particular person over the internet occurred prior to June 2, 2015, and even the conduct that supports Mr. Aziz's conviction for the communication of a threat occurred prior to June 2, 2015. Thus, all the most significant conduct that occurred in this case occurred prior to the increase in the maximum sentence for section 2339B. Therefore, the pre-June 2, 2015 maximum sentence should be the maximum sentence to be applied here.

## II.     Because Section 3A1.4 of the Sentencing Guidelines Has the Potential to Destroy Proportionality in this Case, Particular Attention Must Be Given to Factors that Warrant Variance from the Advisory Guidelines System and Those Factors Required to Be Considered Under 18 U.S.C. § 3553(a).

Whenever defendants like Mr. Aziz are to be sentenced under the weight of USSG § 3A1.4, the terrorism provision of the federal sentencing guidelines, special attention must be paid to both factors "that would warrant a departure from the advisory guidelines system," PSR at 16, ¶83, and factors "under 18 U.S.C. § 3553(a) that would warrant a sentence outside the advisory guidelines system." PSR at 16, ¶84. This is so because the impact of section 3A1.4 is

so profound and extreme that it renders the remainder of the USSG useless. In fact, if courts were to fail to give greater consideration to special factors in cases involving section 3A1.4, the sentencing guidelines would inevitably recommend only maximum sentences in all these cases despite very diverse facts. If this were allowed to occur, the sentencing guidelines would undermine the objective not only of Congress, but of the Sentencing Commission and the Court, itself, to guarantee that the justice system "impose[] appropriately different sentences for criminal conduct of differing severity." USSG § 1A1.3.

### A. The Sentencing Guidelines Are Advisory and Are Intended to Advance Uniformity and Proportionality in Sentencing.

Consequently, the court can reach uniformity by granting a variance under 3553. Indeed, the Supreme Court has insisted that during the sentencing process, a court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States,* 552 U.S. 38, 49-50 (2007). Section 3553(a) includes ten different factors to be considered, among them "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," and the sentencing range recommended by the Sentencing Guidelines. 18 U.S.C. § 3553(a).

As such, the Supreme Court has insisted that the sentencing range recommended by the Sentencing Guidelines is "advisory" and not "mandatory," *United States v. Booker,* 543 U.S.

220, 246 (2005), and that a sentencing court may not presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).

Both the Supreme Court and the Sentencing Guidelines, themselves, have indicated that the role of the Sentencing Guidelines in the consideration of the § 3553(a) factors is to advance two objectives Congress had when it embraced sentencing reform: *uniformity,* or "narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders," and *proportionality,* or "impos[ing] appropriately different sentences for criminal conduct of differing severity." USSC § 1A1.3; *see also Booker v. United States*, 543 U.S. at 264-65 (noting Congress's "preferred direction" in adopting sentencing reform was "helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary"). The Sentencing Guidelines can advance uniformity and proportionality both because the guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. at 49, and because the guidelines "seek to take account of those factors that the Commission's data indicate made a significant difference" historically to courts in sentencing. USSC § 1A1.3 Thus, one would expect the Sentencing Guidelines to be most helpful in the sentencing process when the application of those guidelines helps a court to consider carefully all factors courts have historically considered relevant to sentencing. On the other hand, when the guidelines handcuff the court from carefully considering such factors, we are left with the guidelines, which in this case, is killing a fly with a sledgehammer.

**B.    Congress Intended Sentences for Violations of Both Section 2339B and Section 875(c) to Reflect Differences in the Severity of the Crime and in the Nature of the Defendant.**

The two statutes under which Mr. Aziz pled guilty, section 2339B and section 875(c), each prohibit a wide range of behaviors. Thus, each of these sections should, under proportionality, yield "appropriately different sentences" across its range of prohibited behaviors. USSC § 1A1.3.

In particular, section 2339B(a)(1) prohibits anyone who "provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so." Congress requires that the term "material support or resources" in this statute be interpreted extremely broadly. Specifically, subsection (g)(4) of section 2339B requires that the term "material support or resources" be given the same meaning as that term has been given in section 2339A, and section 2339A, in turn, defines "material support or resources" so expansively that, with the exceptions of "medicine" and "religious materials," the term essentially includes any support of any kind to any degree no matter how effective or ineffective:

> the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

Thus, as Congress has written section 2339B, this section covers an incredibly broad spectrum of behaviors. These range from a teenager with an eighth grade education, like Mr. Aziz, emailing a link to a map of Syria to a person already in Turkey, who apparently could not

figure out on his own how to use MapQuest, on his computer, to get to Raqqa, a stronghold for ISIL for years and no more than 2 hours away from him.

It should come as no surprise, however, that as Congress was drafting a statute intended to regulate a wide variety of behaviors, consistent with proportionality, those who violated that statute would receive a wide variety of sentences reflecting that wide variety of behaviors being regulated. This intent of Congress can be seen both in the plain meaning of section 2339B itself as well as in the objectives behind the Sentencing Reform Act of 1984, which created our current system of sentencing as well as gave life to both the United States Sentencing Commission and United States Sentencing Guidelines.

First, the plain meaning of section 2339B reflects Congress's intent for violators of section 2339B to receive a variety of sentences because Congress would not have stated in section 2339B(a) that a person who violates this section shall be "imprisoned not more than 20 years" unless Congress intended that anyone who violated 2339B must be dangerous, otherwise they would have enacted a statutory mandatory minimum, to accompany the statute. Second, the United States Sentencing Guidelines, themselves, describe at length the intent of Congress in the Sentencing Reform Act of 1984 to guarantee that the criminal justice system "impose appropriately different sentences for criminal conduct of differing severity." USSG § 1A1.3.

**C.      Proportionality Will Be Undermined and Destroyed in Cases Where Section 3A1.4 of the Sentencing Guidelines Must Be Applied, Unless Particularly Thoughtful Consideration Is Given to 3553 Factors that Would Warrant a Variance from the Advisory Guidelines System and Factors that Would Warrant a Sentence Outside the Sentencing Guidelines.**

A sentencing system that sentenced everyone who committed a robbery to the same sentence would be easy to administer, but, as the Sentencing Commission has pointed out, it would be inappropriate to sentence people under a system that did not distinguish between "armed and unarmed robberies, robberies with and without injuries, robberies of a few dollars and robberies of millions." USSG § 1 Part A. Pg. 3.

Thus, when section 3A1.4 of the Sentencing Guidelines is required to be applied in sentencing, there must be a correspondingly heightened effort to consider 3553 factors that would warrant a variance from the advisory guidelines system, more so than any other offense. This is so because section 3A1.4 left unchecked destroys proportionality. It requires that everyone receive the same sentence even when their offenses "are different in important respects." USSG § 1A1.3. For example, supplying ISIS with a 50 million dollar donation, and a cache of weapons, including RPG's and ammunition would result in the same sentence to which Mr. Aziz is exposed.

Section 3A1.4 works to impose uniformity at the expense of proportionality through two requirements. First, section 3A1.4(a) requires that twelve levels be added to the base offense level if that "offense is a felony that involved, or was intended to promote, a federal crime of terrorism." USSG § 3A1.4(a). Second, section 3A1.4(b) requires that"[i]n each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI" USSG § 3A1.4(b), category VI is reserved, traditionally, for defendants who have at least 4 prior felony convictions, and Mr. Aziz has none.

To see just how deeply USSG §3A1.4 would skew the system away from proportionality if that section were left unchecked, one need only compare the sentence of Mr. Aziz for his violation of section 2339B(a)(1) both with and without the application of section 3A1.4. The base level for a violation of 18 U.S.C. § 2339B(a)(1) is 26, as directed by USSG § 2M5.3(a).

The Sentencing Table indicates that a defendant with a base level of 26 still has the potential of receiving 18 different ranges of sentences, from a sentence ranging from 63-78 months to a sentence of life. In addition, these 18 different sentences might be arrived at in 108 different ways depending on all the other considerations given weight by the sentencing guidelines, considerations, which have been "based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 49 (2007). When, however, the twelve levels required by USSG § 3A1.4(a) are added to that base level of 26, and then the defendant's criminal history category, regardless of whether he has a conviction or not, falls into category VI. Since section 2339B itself only allows for a maximum sentence of 15 years, that fifteen year maximum sentence becomes the only sentence that could be recommended under the guidelines when section 3A1.4 is factored unchecked into this process. Thus, were it not for section 3A1.4, someone in Mr. Aziz's situation could potentially receive a sentencing recommendation from the sentencing table of anywhere from 63 months to fifteen years, the statutory maximum, but when section 3A1.4 is applied unchecked, every defendant must receive the maximum sentence of fifteen years, since the suggested guideline, exceeds 15 years.

Congress' intent of proportionality should be recognized. Unchecked, however, section 3A1.4 destroys proportionality in the sentencing process. Therefore, Congress could not have

intended anything like section 3A1.4 to function unchecked in the sentencing process.

Furthermore, given the magnitude of the effect of section 3A1.4 on uniformity in the sentencing

process, only two checks exist that can balance that effect: the application of factors that would

warrant a variance from the advisory guidelines system and through application of factors under

18 U.S.C. § 3553(a). Respectfully, if proportion is to be preserved in a case such as this one,

those two sets of factors must be considered with a particular sensitivity to the heightened

importance those factors must take on in a case as unique as this one. Thus, that heightened

importance of the 3553 factors must be factored in now (*See* Deconstructing the 6.5.56 Section

3A1.4 Sentencing and Other Failures in Cases of Support for Foreign Terrorists).

**III.    A Variance from the Advisory System Guidelines Is Warranted by Both Mr. Aziz's Age, Mental and Emotional Health, and Criminal History and the Degree to Which the Violation Threatened a Security Interest of the United States, the Volume of the Funds or other Material Support or Resources Involved, and His Extent of Planning or Sophistication.**

Section 5 of the United States Sentencing Guidelines identifies circumstances that may

give rise to variances from sentences otherwise to be recommended by the Sentencing

Guidelines. Section 5K2.0 (A) (c) points out that these factors need not be viewed in isolation,

but can be considered in combination, and, in fact, such a combination may give rise to a

variance even if none of the characteristics "independently is sufficient to provide a basis for

variance." Section 5K2.0(c) goes on to point out, however, that this is true only if:

    (1)    such offender characteristics or other circumstances, taken together, make the case an exceptional one; and

    (2)    each such offender characteristic or other circumstance is—

        (A)    present to a substantial degree; and

(B)    identified in the guidelines as a permissible ground for departure, even if such offender characteristic or other circumstance is not ordinarily relevant to a determination of whether a departure is warranted.

Three such factors actually come together here to justify a departure. First, Mr. Aziz's age, USSG § 5H1.1, his mental and emotional condition, USSG § 5H1.3, and his lack of prior criminal history come together to justify such a departure. USSG §5K2.0(a)(3). Although technically, Mr. Aziz's lack of any prior criminal history is factored in under the Sentencing Guidelines, as noted earlier, the operation of section 3A1.4, the terrorism enhancement section of the sentencing guidelines, drives that lack of criminal history out of the sentencing calculation of the sentencing guidelines. Therefore, for the sentencing process to preserve proportionality, the absence of any prior criminal history in Mr. Aziz's record must be viewed as a factor "not adequately taken into consideration," USSG § 5K2.0(a)(3), and, thus, a ground for variance.

As noted earlier, in a case like this one, governed by section 3A1.4, these departures play a particularly important role in the sentencing process because they work to insure proportionality in sentencing when the rest of the guidelines are no longer able to.

**A.    A Departure from the Advisory System Guidelines Is Warranted Because Mr. Aziz Has No Prior Criminal History, He Was a Teenager at the Time of His Arrest, and the Degree of Isolation He Was Growing up in Left Him Without the Mental Capacity and Social Maturity He Needed to Filter Through the Propaganda He Encountered on the Internet.**

In combination, Mr. Aziz's lack of a prior criminal history, his age, and his mental and emotional condition provide more than adequate grounds for variance from the recommendation generated by the Sentencing Table and from the maximum sentence allowable under section 2339B. First, given Mr. Aziz's lack of prior criminal history, he would normally be in Criminal

History Category I on the Sentencing Table. However, section 3A1.4 requires that the Sentencing Table treat him as Category VI, the highest degree of career offender.

Second, the Internet ISIL fantasies that led to Mr. Aziz's convictions began when he was only seventeen, and, at the time of his arrest, Mr. Aziz was still only nineteen-years-old, seven years younger than "[t]he average age of the American ISIS supporter at the time of arrest." Lorenzo Vidino & Seamus Hughes, *ISIS in America: From Retweets to Raqqa* 5 (2015), available:https://extremism.gwu.edu/sites/extremism.gwu.edu/files/downloads/ISIS%20in%20America%20-%20Full%20Report.pdf.   As the United Stated Supreme Court pointed out in *Roper v. Simmons,* 543 U.S. 551, 570 (2005), the "irresponsible conduct of juveniles" "is not as morally reprehensible as that of an adult" and has "a greater claim" on forgiveness than that of an adult for three reasons:

    1)  "'[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young,'" *id.* at 569;

    2) "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," *id*.; and

    3) "the character of a juvenile is not as well formed as that of an adult." *Id.* at 570. Although Mr. Aziz was only legally a juvenile for part of the time he was immersed in ISIL propaganda, these observations are still applicable to him. Youth is not a monolithic condition that suddenly ends at eighteen. Instead, some degree of immaturity and vulnerability continues,

although hopefully lessens, as one continues to proceed through certainly one's late teens. This is particularly true for someone growing up under the conditions in which Mr. Aziz lived.

Third, Mr. Aziz had been lured into these Internet fantasies precisely because he was in the particularly vulnerable and isolated group ISIL targets for "the constant feed, the constant touching" of ISIL's propaganda barrage. *Testimony of James B. Comey, Director of Federal Bureau of Investigation (FBI), Senate Select Committee on Intelligence, Counterterrorism, Counterintelligence, and the Challenges of "Going Dark,"* July 8, 2015.

Mr. Aziz was, as then FBI Director James Comey described this group to the United States Senate, a young person "seeking some centering in their life." *Id.* At the time Mr. Aziz first fell prey to the ISIL propaganda machine, he was a seventeen-year-old living in complete isolation with his parents. He had no friends, he had no job, and he had not attended a school in seven years. PSR at 12, ¶63. His brother and sister moved out because of their over-bearing mother. He could not participate in sports, join clubs, watch television, or go to movies. Although technically homeschooled, Mr. Aziz, at age seventeen, had not advanced in school beyond the eighth grade; yet, he had also never been tested for nor diagnosed with a learning disability. PSR at 12, ¶61, ¶64. This was true even though his mother, who supervised his homeschool program, was a former school principal. PSR at 11, ¶57. From age fifteen to age sixteen, Mr. Aziz was enrolled for homeschooling in the Keystone online school program, but after eighteen months registered in the ninth grade, he still had not completed that grade. PSR at 12, ¶64. When he was arrested at age nineteen, Mr. Aziz still did not have a driver's license and could not leave the house without one of his parents.

Mr. Aziz is not the first American teenager in need of "centering" to fall prey to ISIL propaganda and turn up on the FBI's radar, but he may well be the first to have such a severe sentencing recommendation solely in response to activities on the Internet. Shannon Conley, for example, who was sentenced at age nineteen and whose violations occurred, like those of Mr. Aziz, when she was between 17 and nineteen, was sentenced to serve 48 months in federal prison, followed by three years on supervised release, during which she would serve 100 hours of community service. *United States v. Conley,* 1:14-cr-163-RM, Judgment in a Criminal Case (Doc. 79), at 1-4 (D. Colo. 2015). Similar to the charges to which Mr. Aziz pled guilty, Ms. Conley pled guilty to "[c]onspiring to provide material support to a foreign terrorist organization." *United States v. Conley,* 1:14-cr-163-RM, Plea Agreement and Statement of Facts Relevant to Sentencing (Doc. 37), at 1 (D. Colo. 2015). Ms. Conley, however, was charged and convicted under "18 U.S.C. § 371, referencing 18 U.S.C. § 2339B," rather than under section 2339B itself. *Id.* at 1. Section 371 carries a maximum prison sentence of five years rather than the maximum of twenty years carried by section 2339B. Despite the difference in the sections under which each was charged and the relative length of Ms. Conley's sentence compared to Mr. Aziz's exposure is drastic. Ms. Conley's efforts to provide support to a foreign terrorist organization were far more significant and far more sophisticated than anything engaged in by Mr. Aziz.

Ms. Conley's activities, like Mr. Aziz's, began on the internet. *Id.* at 7, ¶3. There, Ms. Conley actually met the person who would become her co-conspirator, and during their communications, they "shared their view of Islam as requiring participation in violent jihad." *Id.*

The co-conspirator revealed to Ms. Conley that he was an active member of ISIS fighting in Syria, and Ms. Conley and her co-conspirator then "decided to become engaged; and together with each other and others known and unknown, arranged to have Conley travel to Syria to be with her [fiancé]." *Id.* at 8, ¶3.

Ms. Conley was, at the time, a certified nurse and wanted to become an ISIS camp nurse once she arrived in Syria. Lorenzo Vidino & Seamus Hughes, *ISIS in America: From Retweets to Raqqa* 30 (2015), available at https://extremism.gwu.edu/sites/extremism.gwu.edu/files/downloads/ISIS%20in%20America%20-%20Full%20Report.pdf. Ms. Conley also intended "to fight [for ISIS] if it became necessary to do so." *Conley,* Statement of Facts (Doc. 37), at 8, ¶4. To prepare her to fight for ISIS, Ms. Conley "joined the U.S. Army Explorers (USAE) to be trained in U.S. military tactics and in firearms," and Ms. Conley "traveled [from Colorado] to Texas to attend the USAE training." *Id.* at 8, ¶¶ 6-7. Ms. Conley also received National Rifle Association certification in preparation for serving ISIS, and the search of her home after her arrest "recovered shooting targets labeled with the number of rounds fired and distances." *Id.* at 9, ¶¶ 11-12. Ms. Conley was ultimately arrested by the FBI at Denver International Airport as she attempted to board a flight to Turkey on her way to meeting up with her fiancé and joining an ISIS camp. *Id.* at 9, ¶9. Mr. Aziz took no such similar action. In fact, he never even left his home, and, therefore, could never have been a part of any kind of meeting.

In a statement discussing the appropriateness of Ms. Conley's sentence, U.S. Attorney John Walsh expressed concern not only for protecting the public but also for protecting Ms.

Conley from the consequences of her own behavior.  U.S. Attorney Walsh stressed that, "[t]he defendant in this case got lucky," because the FBI apprehended her before she had a chance to travel overseas, and he also pointed out that had Ms. Conley "succeeded in her plan to get to Syria, she would likely have been brutalized, killed or sent back to the United States to commit other crimes."  In fact, on numerous occasions, before her arrest, "Special Agents with the FBI [had] met with her in attempts to persuade her not to carry out her plans to travel overseas to provide support to a foreign terrorist organization and to engage in violent jihad." *District of Colorado U.S. Attorney's Office, Arvada Woman Sentenced for Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization,* FBI.gov (Jan. 23, 2015), available at https://www.fbi.gov/contact-us/field-offices/denver/news/press-releases/arvada-woman-sentenced-for-conspiracy-to-provide-material-support-to-a-designated-foreign-terrorist-organization.


Unlike Ms. Conley, Mr. Aziz never attempted to board a plane so he could travel to an ISIS base, and he never trained in firearms nor in military tactics.  He was not a certified nurse, nor did he have any other specialized skills he could offer to a terrorist group.  Ms. Conley attained a status through her activities that made the government want to debrief her. *Conley,* Statement of Facts (Doc. 37), at 2.  Mr. Aziz never did. With Mr. Aziz, they had no such interests. Mr. Aziz posted violent and offensive language on the Internet as he bragged and postured his way through an Internet fantasy.  He was an isolated teenager with an eighth grade education behaving like a boorish seventh or eighth grader trash talking during an online video game.  Unfortunately, he did not have the good judgment to recognize the video game he chose to play was real life.

Like Ms. Conley, Mr. Aziz was a very vulnerable teenager, who got trapped by ISIS propaganda on the Internet.  In Ms. Conley's case, her youth and vulnerability not only affected her sentence, but it prompted the FBI to "me[e]t with her in attempts to" protect her from herself. Vidino & Hughes, *ISIS in America,* at 31.

Ms. Conley is not the only teenager in need of "centering" to be so treated by the Department of Justice.  In another case similar to Mr. Aziz's involving teenagers being drawn in by ISIS on the internet, "[t]wo Somali-American sisters aged 15 and 17, and their 16-year-old friend of Sudanese descent" "engaged with ISIS supporters online," over a number of months, "posting ISIS propaganda and expressing their desire to travel to Syria." *Id.* at 8. Vidino & Hughes, *ISIS in America,* at 8.

Ultimately, the three teens boarded a plane in Denver in an attempt to reach Syria.  The FBI, however, contacted German authorities, who intercepted the girls at the Frankfurt International Airport and returned them to the United States. *Id.* at 8-9. "US authorities released the trio to their families without charges." *Id.* at 9.

The response of the justice system to the behavior of Ms. Conley and the three teenagers apprehended in Germany and then released to their parents cannot be explained by their gender because § 5H1.10 of the Sentencing Guidelines makes it clear that gender is an inappropriate factor to be considered in sentencing.  Instead, that treatment reflects the Recognition by the justice system of the age, mental and emotional vulnerability, and prior criminal history of the

individuals involved, as well as the commitment of the Department of Justice to "explor[e] options to intervene with would-be violent extremists before violence occurs, and to address disengagement and rehabilitation, including 'off ramps' on the path of radicalization to violence." *Assistant Attorney General John P. Carlin Delivers Remarks on Domestic Terrorism at an Event Co-Sponsored by the Southern Poverty Law Center and the George Washington University Center for Cyber and Homeland Security's Program on Extremism, United States Department of Justice (Oct.14, 2015),* available at https://www.justice.gov/opa/speech/assistant-attorney-general-john-p-carlin-delivers-remarks-domestic-terrorism-event-co.

For purposes of uniformity, consistency, and proprietary, Mr. Aziz's sentence should reflect these factors as well. When Mr. Aziz first became ensnared by ISIS propaganda, he was too young to give his own consent to join the United States military. Even today, Mr. Aziz would not be able to enlist because his eighth grade education falls far short of the military's requirement for a high school diploma or at least a GED. *Are You Eligible to Join the Military?,* Military.com, available at www.military.com/join-armed-forces/join-the-military-basic-eligibility.html. Unless Mr. Aziz's 3553 factors for variance are appropriately considered, the Sentencing Guidelines would recommend that Mr. Aziz serve twenty-five years in prison for providing "material support to a designated foreign terrorist organization," when our own government has recognized that Mr. Aziz lacks the maturity, knowledge, and expertise necessary to contribute to or even join our own armed forces.

This, of course, does not mean that every teenager sentenced for providing material support to a terrorist organization is or has to be treated similarly. In *United States v. Amin,*

26

1:15-cr-164 (E.D. Va. 2015), for example, the court was confronted with a much different sort of teenager behaving in a much different sort of manner, and in that case, the teenager received appropriately a much different sentence.  Like Mr. Aziz, Mr. Amin had used the Internet to support a terrorist organization, and also like Mr. Aziz, Mr. Amin had no prior criminal record. Beyond that, however, Mr. Amin and Mr. Aziz were very different individuals who had behaved in very different ways.  First, Mr. Amin was a much more accomplished teenager than is Mr. Aziz.  Second, Mr. Amin's use of the internet was far more sophisticated, and third, Mr. Amin's activities on behalf of ISIL were not solely on the Internet but went beyond the Internet with tragic consequences.

First, although Mr. Amin was "one month shy of his 18th birthday" at the time of sentencing, he was still described as a person who was "well-considered, sophisticated," and "persuasive," and as a person with "great intellectual capacity" but also with "a radical mind." *United States v. Amin*, 1:15-cr-164, Motion for One Level Reduction Pursuant to U.S.S.G. 3E1.1(b) and Position of the United States with Respect to Sentencing (Doc. 15), at 3 (E.D. Va. 2015).  This is a far cry from Mr. Aziz, who has been isolated much of his life, has only an eighth grade education, and has accepted responsibility for his actions. PSR at 11, ¶52. The belated acceptance of his plea reveals his immaturity, and failure to recognize that re-tweeting this invective dialogue and grisly videos promotes the notion that the West is the enemy of every Muslim, not to mention his inability to understand that it was against the law.

Second, with respect to Internet usage, Mr. Amin consistently had more than twice as many people reading his posts on the Internet as did Mr. Aziz. *United States v. Amin*, 1:15-cr-

27

164, Statement of Facts (Doc. 7), at 2, ¶5 (E.D. Va. 2015). Furthermore, while Mr. Aziz's posts were largely brief and general, Mr. Amin wrote "highly-technical articles" on his blog, which was "targeted at aspiring jihadists and ISIL supporters," and these articles detailed topics like the use of encryption and anonymity software and the use of the virtual currency Bitcoin as a means to create a "Dark Wallet" and anonymously fund ISIL. *Id.* at 4, ¶8.

Most importantly, however, unlike Mr. Aziz, Mr. Amin went beyond Internet usage because he also reached out to people personally, and successfully radicalized other identifiable individuals in his own area, including 18-year-old Reza Niknejad. Mr. Amin, in fact, "personally facilitated Niknejad's travel to Syria to join ISIL" by:

- connecting Mr. Niknejad with other individuals traveling to Syria to join ISIL and individuals already in Syria working with ISIL," at *id.* at 4, ¶¶11-12;

- transporting Mr. Niknejad to the airport to catch his overseas flight, *id.* at 5, ¶15;

- explaining Mr. Niknejad's travel itinerary to him, *id.* at 5, ¶15;

- delivering to Mr. Niknejad's family a letter from Mr. Niknejad indicating Mr. Niknejad would not be seeing his family again, at *id.* at 5, ¶19; and

- providing a concocted story to investigators looking for Mr. Niknejad. *Amin, Sentencing* (Doc. 15), at 3.

As the United States described the fruits of Mr. Amin's labors, "Under a best case scenario, Niknejad will return to the United States to be prosecuted and incarcerated for his activities. It is far more likely, unfortunately, that he will accomplish the goal that this defendant set out for him: martyrdom in the name of ISIL." *Id.* at 2. Even given Mr. Amin's sophistication, the

effectiveness of his efforts, and the tragic consequences of his actions, the court sentenced him to 136 months in prison, less than half of Mr. Aziz's of the sentence that Mr. Aziz is exposed to. *United States v. Amin*, 1:15-cr-164, Sentencing (Doc. 19) (E.D. Va. 2015).

### IV.    A Six Level Enhancement Under U.S.S.G. § 2A6.1(b)(1) Should Not Be applied to Mr. Aziz's Sentence Under 18 U.S.C. 875(c)

Mr. Aziz's sentencing does not warrant the six level enhancement applied under U.S.S.G. § 2A6.1(b)(1) to the offense under 18 U.S.C. 875(c).  Section 875(c) makes criminal one's conduct when one "transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another." 18 U.S.C. 875(c). While section 875(c) makes criminal a "communication containing any threat," whether posed by the defendant or some third party, section 2A6.1(b)(1) reserves its six level enhancement, and thus the most serious punishments for this offense, to those situations where the defendant has engaged in "conduct evidencing an intent to carry out such threat." U.S.S.G. § 2A6.1(b)(1).  In United States v. D'Amario, 350 F.3d 348 (3d Cir. 2003), the Third Circuit explicitly indicated that this language in section 2A6.1(b)(1) only applies to cases where "the defendant intended to carry out his or her threat." 350 F.3d 348, 357 (3d Cir. 2003).  Both the Second Circuit, U.S. v. Morrison 153 F. 3d 34 (2d Cir. 1998), and the Seventh Circuit, United States v. Sullivan75 F.3d 297, 303 (7th Cir. 1996), have applied section 2A6.1(b)(1) in a manner consistent with the Third Circuit's understanding.


Thus, the six level enhancement required by section 2A6.1(b)(1) should not apply here because Mr. Aziz never intended to carry out the threat posed in the "hit list" originated by

Junaid Hussain.  Mr. Aziz was merely one of the masses of people who reposted Junaid

Hussain's list, and one of least trained and least visible people to do so.  In fact, Mr. Aziz's role

in the threat was so minimal that of the 102 people solicited for victim/restitution information in

this case, only seven responded, only five made a claim for restitution, and not one indicated any

awareness of Mr. Aziz's posting in particular. PSR at 8-9, ¶¶22-28(a). There must be some

conduct, other than sitting on your couch that would support this enhancement.

**V.     Under Section 3553(a), the Nature and Circumstances of Mr. Aziz's Offense, His History and Characteristics, and His Potential for Rehabilitation All Warrant a Variance from the Advisory System Guidelines.**

Under 18 U.S. Code § 3553(a), a court shall consider "the kinds of sentences available,"

18 U.S.C. § 3553(a)(3), and the range of sentences recommended by the Sentencing Guidelines,

18 U.S.C. § 3553(a)(4), when determining the sentence a defendant shall receive.  In addition,

however, section 3553(a) also requires a court to consider other sets of factors during sentencing

including, in particular, "the nature and circumstances of the offense" and "the history and

characteristics of the defendant," 18 U.S.C. § 3553(a)(1); and "the need for the sentence

imposed" to protect society while serving the needs of the defendant. 18 U.S.C. § 3553(a)(2).

Both of these additional sets of factors indicate the need for a sentence well below the maximum

sentence recommended by the advisory guidelines.

**A.     The Nature and Circumstances of Mr. Aziz's Offense and His History and Characteristics Warrant a Variance from the Advisory System Guidelines Because the "Material Support" Mr. Aziz provided Was Minor Compared to That Provided**

**by Defendants in Other Cases and Because Mr. Aziz Was an Isolated Teenager with an Eighth Grade Education.**

Both "the nature and circumstances of the offense" and "the history and characteristics of the defendant," present mitigating factors under 18 U.S.C. § 3553(a) that warrant a sentence outside the advisory guidelines system because of the ineffectiveness of Mr. Aziz's actions, his isolation and lack of education, and his lack of criminal history.

### 1. The Nature and Circumstances of the Offense

Jalil Aziz has pled guilty to Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization and Transmitting a Communication Containing a Threat to Injure. Both of these violations stem exclusively from ISIL related postings by Mr. Aziz on the Internet, as mentioned numerous times. Mr. Aziz never traveled for a terrorist organization. He never planned to travel for such an organization, he never raised any money for such an organization, and he never plotted for such an organization. In fact, Mr. Aziz never traveled outside the United States and seldom beyond his own neighborhood. Mr. Aziz was a teenager posting on the Internet from his parents' house, caught up in what former FBI Director James Comey described as the "chaotic spider web of Twitter." James B. Comey, *Standing Together Against Terrorism and Fear: Tossed by the Waves but Never Sunk* (NYPD Shield Conference, New York City, NY, Dec. 16, 2015), available at *https://www.fbi.gov/news/speeches/standing-together-against-terrorism-and-fear-tossed-by-the-waves-but-never-sunk*. As Lorenzo Vidinio and Seamus Hughes, Director and Deputy Director of the Program on Extremism of George Washington University, might characterize him, Mr.

Aziz was someone "whose contributions to ISIS fail to exceed online declarations of support and personal fantasies of joining the group" and, therefore, someone at the bottom "end of the mobilization spectrum." Vidionio & Hughes, *Isis in America,* at 30.

As someone whose activities were exclusively on the Internet, Mr. Aziz was particularly easy for the Government to monitor and, with all due respect, if they actually thought he was a danger, they would not have let him continue. While the FBI may be able to follow postings and conversations on social media, as former FBI Director Comey pointed out, "[i]t's highly unlikely" an FBI agent is going to be the one to know about radicalization going on behind closed doors." Comey, *Standing Together,* available at *https://www.fbi.gov/news/speeches/standing-together-against-terrorism-and-fear-tossed-by-the-waves-but-never-sunk.*

> a.    **The Nature and Circumstances of the Charge of Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization**

Fifty-one percent of those charged with ISIS-related activities attempted to travel overseas or successfully departed from the United States either to fight for or train with terrorist organizations. The majority of these are over 18-years old. Vidino & Hughes, *ISIS in America,* at 7.  Michael Todd Wolfe, for example, was arrested while trying to board a flight at George Bush International Airport in Houston with his wife and two children as part of a plan to reach a Syrian ISIL base through Denmark and then through Turkey. *United States v. Wolfe*, 1:14-cr-213, Criminal Complaint (Doc. 1), at 11, ¶ 29 (W.D. Tex. 2014).  In preparation for the trip, Mr. Wolfe had purchased a "durable, thick pair of glasses with a headstrap" that would "hold up on

the battlefield," *Wolfe,* Criminal Complaint (Doc. 1), at 6, ¶10, and invested a great deal of time

investigating ISIL militias he might join, arranging his finances, and setting up a personal

training program including "martial arts, running and Cross-Fit." *Wolfe,* Criminal Complaint

(Doc. 1), at 9, ¶21.  Mr. Wolfe had also shown ISIL propaganda to potential ISIL recruits in his

home and then proclaimed to these potential recruits that "'Allah put jihad in front of people to

determine who the real men are.'"  *Wolfe,* Criminal Complaint (Doc. 1), at 6, ¶15.

　　　Joseph Farrokh, meanwhile, was arrested as he was boarding a plane at the Richmond

International Airport for Jordan via Chicago. *United States v. Farrokh,* 1:16-cr-00020-AJT,

Statement of Facts (Doc. 30), at 10, ¶37 (E.D. Va. 2016).   Mr. Farrokh was also attempting to

reach Syria so he could fight for ISIL. *Farrokh,* Doc. 30, at 9, ¶35.  Prior to his attempt to travel

to join ISIL, Mr. Farrokh had sworn before others an oath of allegiance to the leader of ISIL

recognizing the implications of doing so, *Farrokh,* Statement of Facts (Doc. 30),  at 7-8, ¶¶24-

25, given his co-conspirator Mohamed Elhassan $600 to help cover Mr. Elhassan's travel

expenses to join ISIL, *Farrokh,* Statement of Facts (Doc. 30),  at 3, ¶5, and indicated not only a

desire "to kill for Allah's sake," *Farrokh,* Statement of Facts (Doc. 30),  at 6, ¶ 18, but a belief

that fighting American Special Forces "is the best." *Farrokh,* Statement of Facts (Doc. 30), at 9,

¶33


　　　Unlike Mr. Wolfe and Mr. Farrokh, Mr. Aziz only shared fantasies on the Internet about

going overseas, and that sharing of fantasies was never anything more than talk, offensive and

invective talk certainly, but nonetheless talk. There was no attempt to travel. His blunt efforts at

strangely, directing someone who, was physically in Turkey, for directions to get to Raqqa,

Syria, evidences Mr. Aziz's basic knowledge of world geography, not to mention common sense.

Raqqa, Syria was, by 2013, long considered a centralized base for ISIS militia. Providing

directions, for a 2-hour drive, cannot be considered diabolical. Mr. Aziz could not have acted on

any of his talk even if he had wanted to. At the time Mr. Aziz had no passport, no driver's

license, no credit cards, no job, no bank account, and no plan to change any of this. The only

money Mr. Aziz had, $500, was held for him by his mother. He had an eighth grade education,

was between seventeen and nineteen-years-old, and was living with his parents, who decided

everything from when he could step out of the house to what books he could read.


Mr. Wolfe received a sentence of 82 months, or just over a quarter of the sentence

recommended for Mr. Aziz. *Wolfe,* Amended Judgment (Doc. 50), at 2. Mr. Farrokh was

sentenced to 102 months in prison, or just over a third of Mr. Aziz's recommended sentence.

*Farrokh.*


Those charged with ISIS-related activities who do not plan to travel overseas often,

instead, accumulate equipment that can be used to support ISIS. For example, one group in the

Saint Louis area was charged after they had purchased "'United States military uniforms, tactical

combat boots, surplus military goods, tactical gear and clothing, firearms accessories, optical

equipment and range finders, rifle scopes, equipment, and supplies'" for a terrorist battalion in

Syria. Vidino & Hughes, *ISIS in America,* at 28 (citing *United States of America v. Ramiz Zijad

Hodzic, et. al.,* Indictment (February 5, 2015)).


Although Mr. Aziz on occasion posted pictures he had found on the Internet of guns and

equipment, he never actually acquired any of these items. *See, e.g.,* PSR at 6, ¶7(b). In fact, Mr.

Aziz normally could not go shopping or leave the house without a parent. Mr. Aziz, however, did have a backpack, which was searched at the time of his arrest. The most ominous item in the backpack was ammunition, which belonged to Mr. Aziz's father, who had purchased the ammunition legally while he was considering buying a gun. PSR at 6, ¶13. The purchase of the gun would have been in response to a burglary in the neighborhood, but the father ultimately decided not to buy a gun. The remainder of the contents of the backpack were a ski mask, a knife with a broken handle from the family's kitchen, a thumb drive, a tin filled with various over-the-counter-medications, a toothbrush, flashlights, a lighter, fingerless gloves, nail clippers, cording, and a pocket watch, all items that Mr. Aziz had gathered from around the house. PSR at 6, ¶13. Unlike the bag that a soldier, a survivalist, or a world traveler might prepare, the bag contained no food, no clothing, no bedding, no water bottle, no soap, no shampoo, no toothpaste, no money, credit cards, or travelers checks, and very little in the way of first aid items.

Those charged with ISIS-related activities who do not plan to travel or to gather equipment will sometimes seek to raise money for the cause. Hawo Mohamed Hassan, for example, helped plan and "participated in fundraising teleconferences in which a speaker from an organization like al Shabaab would give a lecture. *United States v. Hassan*, 799 F.3d 1008, 1015 (8th Cir. 2015). After these lectures, "listeners would pledge money," and Ms. Hassan "would keep track of the donors' phone numbers." *Id.* One of these teleconferences "had over one thousand listeners." *Id.*

In a similar case, *United States v. Jama & Dhirane,* 1:14-cr-00230-AJT (E.D. Va. 2016), Muna Osman Jama and Hinda Osman Dhirane were leaders and organizers of an international

chatroom that raised money also for al-Shabaab on a monthly basis. *United States v. Jama &*
*Dhirane,* 1:14-cr-00230-AJT, Memorandum Opinion and Findings of Fact in Support of Verdict
(Doc. 267), at 6, ¶4 (E.D. Va. 2016).  As part of their support for al-Shabaab, Ms. Jama and Ms.
Dhirane "kept books and records with respect to their fundraising," *id.* at 16, facilitated discrete
mechanisms for transmissions of the funds they raised to al-Shabaab, *id.,* promoted active
relationships with al-Shabaab officials, *id.,* coordinated al-Shabaab speakers to make
presentations to the chatroom, *id.* at 7-8,  ¶5, and "had access to non-public information
pertaining to [al-Shabaab]' s financial needs as well as other activities with which it was
involved, including military activities." *Id.* at 9, ¶11.  The two women also "coordinated to some
degree their fundraising with the specific needs" of al-Shabaab. *Id.*


Mr. Aziz, meanwhile, on one occasion, posted on Twitter, "Perform your Islamic duty.
Support the Jihad with your wealth. Surah Baqarah (2:195) RT & SHARE DM for more info,"
the final part of this allowing potential ISIL donors to message him directly using Twitter.  PSR
at 5, ¶7(f).  No donors were identified by this effort, however, and, more importantly, no
donations were received.


Ms. Hassan, Ms. Dhirane, and Ms. Jama, then, all ran highly sophisticated and successful
fundraising operations to benefit al-Shabaab.  Ms. Hassan was sentenced to ten years in prison,
*Hassan,* 799 F.3d at 1033, Ms. Dhirane was sentenced to eleven years, and Ms. Jama was
sentenced to twelve years. United States Attorney's Office, Eastern District of Virginia, *Women*
*Sentenced for Providing Material Support to Terrorists* (Mar. 31, 2017), available at
https://www.justice.gov/usao-edva/pr/women-sentenced-providing-material-support-terrorists.

Mr. Aziz, meanwhile, made one request for funds online to no one in particular. At the time he did so, Mr. Aziz did not know anyone in a terrorist organization to whom he could give the money if he actually raised any, and he received no contributions in response. Yet, under the sentencing guidelines, Mr. Aziz, for his futile efforts, could potentially be sentenced to twenty years for conspiring to provide material support to a terrorist organization, almost twice what any of the three women actually received.

Finally, Mr. Aziz's efforts to provide support to others trying to travel to support ISIL are far less significant than the efforts of others who received far shorter sentences than the one recommended for Mr. Aziz. In one Twitter exchange while Mr. Aziz was still eighteen, Mr. Aziz was contacted by someone on the Internet who claimed to be "Rami Hujeirat," and, as previously mentioned, Mr. Hujeirat claimed he "was located in Sanliurfa, Turkey and requested assistance travelling to fight for ISIL." PSR at 6, ¶10. In response, Mr. Aziz provided Mr. Huejirat internet access to maps and travel directions to Raqqa, Syria, the Internet contact site for Junaid Hussain, *id.[1]* "a well-known, English-speaking ISIL recruiter and radicalizer based in Syria," PSR at 4, ¶ 7(e), and an encrypted messaging service. CC Aziz Affidavit at ¶ 33. The value of this information was minimal, given the encrypted messaging service did not work, *id.* and it is highly unlikely that anyone who could find Mr. Aziz on the Internet would not be able to find on the Internet on their own a map of Syria and Mr. Hussain, who was at the time ISIL's

---

[1] At the time, he was reportedly regarded as one of the Ranking members of ISIL. The fact that someone with this superior status would not know how, with access to a computer to get directions to Raqqa, Syaria, an ISIL stronghold since 2013, a 2-hour drive away on route 68 from Turkey to Syria, is curious by itself. That's assuming this was in fact Junaid Hussain, who was recently killed in a drone attack (see top cyber Jhadist killed in military drone strike BBC August 2015) Social media expert Junaid Hussain killed in a Drone Strike New York Times November 24, 2016.

central and most prominent propagandist. As then FBI Director James Comey testified before the United States Senate, even a "kid" "can have direct communication with a terrorist in Syria all day and night." Testimony of James B. Comey, Director of Federal Bureau of Investigation (FBI), Senate Select Committee on Intelligence, Counterterrorism, Counterintelligence, and the Challenges of "Going Dark," July 8, 2015.

On two other occasions while Mr. Aziz was still eighteen, Mr. Aziz also responded to requests for assistance by directing the person to communicate with a highly visible internet site linked to ISIL instead of with him. PSR at 6, ¶¶11, 12. In none of these three instances did Mr. Aziz actually participate in the process of radicalizing any of these individuals. In all three instances, the individuals were fully committed to joining ISIL before they ever came in contact with Mr. Aziz. In addition, Mr. Aziz did not use any money or any property of his own to help them, and to the extent that his "support" was "advice" that rose to the level of "expert" as required by sections 2339A and 2339B, it was not "expert" in any professional sense.

Unlike Mr. Aziz, both Mr. Farrokh and Mr. Amin participated in the radicalization of particular identifiable individuals. Mr. Farrokh contributed to the radicalization of his co-conspirator Mohamed Elhassan and even gave him $600 to help Mr. Elhassan cover his travel expenses to join ISIL. *United States v. Farrokh,* 1:16-cr-00020-AJT, Statement of Facts (Doc. 30), at 10, ¶37 (E.D. Va. 2016). Mr. Amin, meanwhile, radicalized 18-year-old Reza Niknejad, connected him with traveling companions, drove him to the airport, explained to Mr. Niknejad his travel arrangements, and deceived investigators trying to locate Mr. Niknejad after his variance. *United States v. Amin*, 1:15-cr-164, Statement of Facts (Doc. 7, at 4-5, ¶¶9-19) (E.D.

Va. 2015). Yet, neither of these men received a sentence even half as long as what is called for in this case. *United States v. Amin*, 1:15-cr-164, Sentencing (Doc. 19) (E.D. Va. 2015).

> **b.    The Nature and Circumstances of the Charge of Transmitting a Communication Containing a Threat to Injure**

On March 21, 2015, Junaid Hussain posted on the internet a list of the names, photographs, ranks, military branches, and addresses of 102 U.S. military service members. Mr. Hussain was at the time, as noted in the previous section, ISIL's central and most prominent propagandist. Mr. Hussain's introduction to this list directed ISIL supporters to "kill [the service members] in their own lands, behead them in their own homes, stab them to death as they walk their streets thinking they are safe." PSR at 4-5, ¶7(e). Mr. Hussain's posting of the list went viral on the Internet that same day.

Given Mr. Hussain's prominence on the Internet and social media, it was no surprise that his posting of the list would immediately go viral. Part of what made Mr. Hussain so valuable to ISIL was his ability to manipulate what then Assistant Attorney General for National Security John P. Carlin described as a "radicalization echo chamber," where followers would rebroadcast and reinforce for each other ISIL's propaganda and calls for violence. *Assistant Attorney General John P. Carlin Delivers Remarks on Domestic Terrorism at an Event Co-Sponsored by the Southern Poverty Law Center and the George Washington University Center for Cyber and Homeland Security's Program on Extremism, United States Department of Justice (Oct.14, 2015),* available at https://www.justice.gov/opa/speech/assistant-attorney-general-john-p-carlin-delivers-remarks-domestic-terrorism-event-co. The magnitude of this echo chamber continues to be immense. U.S. government officials have estimated several thousand Americans consume

ISIS propaganda," Vidino & Hughes, *ISIS in America,* at 21, and the federal government combats 90,000 ISIL tweets a day. Jethro Mullen, *What Is ISIS' Appeal for Young People,* CNN.com (Feb. 25, 2015), available at http://www.cnn.com/2015/02/25/middleeast/isis-kids-propaganda/index.html. Then FBI Director James Comey, himself, described this network as "the chaotic spider web of Twitter," Comey, *Standing Together,* available at *https://www.fbi.gov/news/speeches/standing-together-against-terrorism-and-fear-tossed-by-the-waves-but-never-sunk,* and indicated that through this web, ISIL postings "can go viral in a matter of seconds." Testimony of James B. Comey, Director of Federal Bureau of Investigation (FBI), Senate Select Committee on Intelligence, Counterterrorism, Counterintelligence, and the Challenges of "Going Dark," July 8, 2015.  Not only did Hussain's list gain prominence throughout the Internet, but national and local media outlets also gave the list further exposure with some outlets even seeking interviews with people on the list.  PSR at 22.  Within days, the United States had managed to get the list taken down, and five months after the posting, Mr. Hussain was killed in a U.S. drone strike. No one identified on the list was even injured or threatened.

Mr. Aziz's violation of section 875(c) is a consequence of Mr. Aziz being one of the multitude of people who rebroadcast Mr. Hussain's list as part of Assistant Attorney General Carlin's Internet "radicalization echo chamber" and Director Comey's "chaotic spider web."  In fact, on the day Mr. Hussain posted his list, Mr. Aziz, still eighteen at the time, echoed into this chamber five times over a three-hour-and-twelve-minute span.  In addition to posting his own brief comments, Mr. Aziz posted a link to Mr. Hussain's original post as well as a link to the cover page of the list and a link to the page with the first eight names on the list.

While today Mr. Aziz would not deny the insensitivity, immaturity, and bad judgment reflected in his postings about Mr. Hussain's list, these postings played a very small role in the events actually orchestrated by Mr. Hussain. Mr. Aziz did not create the list, he did not initially post the list, and he had no name recognition, fame or notoriety in the inner or outer circles of ISIS or ISIL that could help promote the list. He had neither the intent nor the ability to bring about the threat himself, nor did he communicate the threat directly or impliedly to anyone on the list. There has not even been a showing that any of the people who were on Mr. Hussain's list ever knew of Mr. Aziz's posts.

In *United States v. Booker*, 543 U.S. 220, 252 (2005), the Supreme Court described two violations of the Hobbs Act, 18 U.S.C. § 371, each involving a threat. As indicated by the Court, the first of these threats was the far less serious and required a far less serious punishment:

> Imagine Smith and Jones, each of whom violates the Hobbs Act in very different ways. Smith threatens to injure a co-worker unless the co-worker advances him a few dollars from the interstate company's till; Jones, after similarly threatening the co-worker, causes far more harm by seeking far more money, by making certain that the co-worker's family is aware of the threat, by arranging for deliveries of dead animals to the co-worker's home to show he is serious, and so forth. The offenders' behavior is very different; the known harmful consequences of their actions are different; their punishments both before, and after, the Guidelines would have been different.

*Id.*

Even the less serious threat in the Court's hypothetical, the one made by Smith, is still far more serious than what Mr. Aziz did here. While Smith's threat involved behavior that Smith planned to engage in immediately, Mr. Aziz's threat involved only possible behavior that some third party might engage in in the future. While Smith expressed his threat directly to his victim

so the victim definitely knew that Smith had threatened him, Mr. Aziz never directly communicated anything to any of 102 U. S. military service members, who were on Mr. Hussain's list.  Finally while Smith's threat was the sole and certain cause of his victim giving Smith money, Mr. Aziz's reposting of Mr. Hussain's list was only a tiny fragment of the threat orchestrated by Mr. Hussain, and there has been no showing that any emotional distress created by Mr. Hussain's list would have been any less had Mr. Aziz never posted a message about it. In other words, both the government and then victim can blame Mr. Aziz for perpetuating the list, not in the creation of ANA, it is worth repeating that the list had already been posted by other individuals and also news outlets. If Smith's conduct is what the Supreme Court uses to capture the bottom end of the threat spectrum, then Mr. Aziz must be barely on that spectrum, and he, therefore, should not be receiving the sentence suggested by the Guidelines.

### 2.    The History and Characteristics of the Defendant

The ideal target for the ISIL propaganda machine in America has proven to be young Americans who are searching for belonging and who lack the ability to filter out misinformation and bad behavior present on the internet.  In fact, "[t]he average age of the American ISIS supporter at the time of arrest is 26." Vidino & Hughes, *ISIS in America,* at 5. Among this group of younger citizens, those who are "seeking some centering in their life," can most easily become seduced by "the constant feed, the constant touching," the "buzz, buzz, buzz, buzz, buzz" of ISIL's Internet propaganda machine. *Testimony of James B. Comey, Director of Federal Bureau of Investigation (FBI), Senate Select Committee on Intelligence, Counterterrorism, Counterintelligence, and the Challenges of "Going Dark,"* July 8, 2015. This is particularly true for those in this group who additionally lack "filters in place" to process the Internet's barrage of

information and its often inappropriate social patterns. Beenish Ahmed, *Why Converts to Islam Are so Susceptible to Becoming Terrorists,* ThinkProgress (Feb. 3, 2016) available at http://thinkprogress.org/why-converts-to-Islam-are -so-susceptible-to-becoming-terrorists-118582cfa179.

 

None of the above is offered to rationalize, justify, or defend Mr. Aziz's actions. He pled guilty and standing by his plea and knew exactly what he was doing. It is only being presented to the court to explain his conduct. Jalil Aziz was, therefore, the perfect ISIL target at the time of his immersion into ISIL propaganda and his ultimate arrest. This immersion began when Mr. Aziz was seventeen and culminated in his arrest at nineteen, still seven years younger than the average ISIL supporter arrested. During this time, Mr. Aziz was most definitely searching for belonging. Mr. Aziz is five feet two inches tall and weighs 180 pounds. PSR at 12, ¶ 60. He has had asthma since the age of six and requires an inhaler. From the age of six until the age of ten, he was so severely bullied in school that his mother ultimately withdrew him from school for protection. PSR at 12, ¶63. Over the next eight years, the family moved five times across four states. PSR at 12, ¶59.

 

During this eight-year period, Mr. Aziz was technically being homeschooled, but he completed only four grades. At the same time, as son as his brother and sister turned 18, they moved out. Despite loving their mother, they could not stand the obsessive control she exercised, daily. When he was ultimately enrolled as a ninth grader in the Keystone on-line school program, he spent eighteen months in the ninth grade but never completed it. PSR at 12, ¶63. Mr. Aziz's homeschool efforts continued after he was withdrawn from the Keystone program, and he

ultimately came to believe that he had graduated from that program even though he had never completed the ninth grade. PSR at 12, ¶ 63. Despite his lack of academic progress, Mr. Aziz has never been diagnosed with a learning disability, nor does he have a history of mental or emotional problems, as noted by the PSR written but one does not need to be a trained clinician to conclude that, at a minimum, Mr. Jalil Aziz would have abandonment and learning disabilities. PSR at 12, ¶ 61.

Mr. Aziz has no criminal history, nor has he ever used drugs or alcohol. The "material support" and the degree of "planning or sophistication" he could lend to a terrorist organization are both minimal. Mr. Aziz has never had a job, nor has he ever had a driver's license. He has never had a credit card or a bank account, and his mother holds the $500 he does have for him. PSR at 12, ¶ 66. Furthermore, Mr. Aziz also does not present a threat to the public. As the Presentencing Report indicates, Mr. Aziz "has clearly demonstrated acceptance of responsibility for the offense," PSR at 11, ¶ 52, he has no prior criminal history and no interest in either drugs or alcohol, and both his current convictions are products of his trying to embrace fantasies on the Internet.

**B.     The Need of a Sentence to Protect Society First While Serving the Needs of the Defendant Warrants a Variance from the Advisory System Guidelines Because Mr. Aziz Has Accepted Responsibility for His Actions and Has A New System Available to Facilitate His Rehabilitation.**

Under section 3553(a)(2), the sentencing process must consider "the need for the sentence imposed":

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

44

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Counsel respectfully submits that a comparison of Mr. Aziz's conduct or lack thereof to any other defendants charged and previously cited in this memorandum reveals that Mr. Aziz is not a disturbed sociopath, obsessed with killing Westerners but someone who wanted to be regarded as having some significance in the world, and was unable to find it. He certainly could not attain any recognition from his mother so endorsing hate, abuse, mutilation, and murder are the outlets he chose. The table was set for someone with vulnerable state of maturity, development, and educational level, or lack thereof.

The need to protect the public from future crimes by the defendant and to provide the defendant with needed training and treatment can be considered together, and both relate to the Department of Justice's expressed interests in fostering, in those drawn in by ISIS's web of propaganda, "disengagement and rehabilitation." *Carlin Remarks,* available at https://www.justice.gov/opa/speech/assistant-attorney-general-john-p-carlin-delivers-remarks-domestic-terrorism-event-co. In fact, Mr. Aziz provides a particularly hopeful opportunity for rehabilitation. The United States Supreme Court endorsed that view in *Roper v. Simmons*, 543 U.S. 551 (2005), that "a greater possibility exists that a minor's character deficiencies will be reformed [than an adult's]." *Id.* at 570. Yet, Mr. Aziz does not present a particularly hopeful opportunity for rehabilitation simply because of his age, or even because of his lack of any criminal history, his abstinence from drugs and alcohol, and his acceptance of responsibility for his offenses. PSR at 11, ¶ 52.

Perhaps most importantly, Mr. Aziz provides a particularly hopeful opportunity for rehabilitation because of the keen interest Mr. Aziz's older half-brother Ibrahim Aziz has shown in Mr. Aziz and the support network Ibrahim has already begun to develop for his younger brother (*See* Letter from Ibrahim Aziz attached as Exhibit 1B).

Ibrahim is 34 years old, has sixteen years of experience working in information technology, and holds over ten industry-recognized certifications. Ibrahim currently works for ICMA-RC, a retirement investment corporation in Upper Marlboro, Maryland, as a senior land specialist with particular expertise in infrastructure engineering. Although both Ibrahim and Mr. Aziz's half-sister, Shahida Aziz, felt compelled to move out of the family home before the age of eighteen, Ibrahim has remained deeply interested in Mr. Aziz's welfare and has sought over the years to reconcile with the family. (*See* Exhibit 1B) Mr. Ibrahim Aziz has had candid and careful conversations with Jalil Aziz in an attempt to get him to recognize that what he did was wrong, illegal, and hateful.  In this current political climate, invectives endorsing acts of violence against everyone, including Muslims, is most certainly wrong and results from a distorted reading of the *Quran.*  Ibrahim or his contracts were with the Department of Justice, which required a security clearance that he obtained, only to have it suspended upon his brother's arrest and no God or history can rationalize it. His pattern of using a phone only to promote, endorse, and regal in gratuitous killing was not born out of any reading, he could not have done, nor traveling, which he was prevented from doing. He never felt home and never had the freedom to interact with other people, share views, political or otherwise, the Quran, or the enslavement of Muslims by the French in the early 1900's. It was born out of boredom, isolation, low self-esteem, and a

46

sense of worthlessness, which was inculcated in him over the Internet. In addition, it is also, of course, illegal. Ibraham Aziz has advised his brother that, understandably, he is going to receive a severe sentence, but, because of his age, he will be released someday and seriously needs to think about what he wants to do with his life.

More importantly, Ibrahim is the founder and executive director of H.O.P.E. Diversified Management, a non-profit organization, whose focus is providing vocational and IT training as well as mental health services to underserviced communities, in the area of Prince George's county to Baltimore, Maryland, including those victimized by ISIS propaganda in an effort to reprogram them. Ibrahim has also pioneered an accredited training program with the National Academy of Social Workers to educate social workers on how to effectively communicate with Muslim Families involved in the Child Welfare System. Ibrahim recently spoke at the Religious Freedom Center at a program entitled *Effectively Countering Extremism: a Comprehensive Grassroots Approach.* The program was streamed live by both ABCNews.com and CSPAN1.com. The Religious Freedom Center described the speakers it had assembled as "a highly-trained and diverse group of experts on radicalization, Islamic theology, human development, social services, prison chaplaincy and community organizing." Other speakers at the program included Jeffrey Carroll, Assistant Chief of the Baltimore Metropolitan Police Department, managing the Homeland Security Bureau (HSB), and Mujahid Muhammad, president of a youth based mental health and emotional wellness organization in Maryland and a member of the Baltimore City Mayor's Youth Safety Commission.

Ibrahim has remained in regular contact with Mr. Aziz since the younger brother's incarceration, despite his mother's insistence not to visit him. Ibrahim is supportive of his younger brother's desire to become a chef and, should the opportunity present itself, has created opportunities for Mr. Aziz to work on his GED and begin obtaining culinary arts credits at Prince George's County Community College Prince George's county. Ibrahim has also lined up construction work for Mr. Aziz with Structures Unlimited, a real estate rehabilitation firm, and counseling services from Mujahid Muhammad, as noted, a leading expert in helping young people address the factors that made them vulnerable to radicalization. His brother is also adamant that Jalil will not have a cell phone for the first 6 months of his release and/or until he can prove that he can use it responsibly. Lastly, Ibrahim will ensure that Jalil does not apply for a passport.

### C.    The Need to Avoid Unwarranted Disparities Supports a Sentence of 78 Months.

Section 3553(a)(6), finally directs sentencing judges to "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The section's focus, then, is on uniformity with respect to "similar conduct" rather than with respect to similar charges. The Supreme Court has stressed this point in *United States v. Booker,* insisting that Congress's pursuit of uniformity through the current sentencing statutes "does not consist simply of similar sentences for those convicted of violations of the same statute" but "consists, more importantly, of similar relationships between sentences and real conduct." *United States v. Booker,* 543 U.S. 220, 253-54 (2005). Thus, as a court seeks to avoid unwarranted disparities, the court needs to focus on the "real conduct" defendants engaged

in rather than on the charges they ultimately may have been convicted of or pled guilty to in relation to that conduct.

The twenty-five year maximum sentence that Mr. Aziz is exposed to, creates unwarranted disparity with the sixty month sentence received in *United States v. Conley*, 14-cr-163, Final Judgment (Doc. 79), at 7 (D. Colo. 2014) (*see supra,* at 20-24); with the 82 month sentence received in *United States v. Wolfe*, 1:14-cr-213, Amended Judgment (Doc. 50), at 2 (W.D. Tex. 2014) (*see supra,* at 31-33); with the 102 month sentence received in *United States v. Farrokh*, 1:16-cr-20  (*see supra,* at 32-33, 37-38); with the 132 and 144 month sentences received in *United States v. Jama & Dhirane*, 1:14-cr-00230-AJT (E.D. Va. 2016) (*see supra,* at 35-36); with 120 month sentence received in *United States v. Hassan*, 799 F.3d 1008, (8th Cir. 2015) (*see supra,* at 34-36); and with the decision not to bring charges against the two Somali-American teenage sisters and their 16-year-old Sudanese-American friend who tried to travel to Syria to join ISIL. (*see supra,* at 24). In fact, one would expect that given Mr. Aziz's lack of prior criminal history, his age, his degree of isolation and lack of education, the relative nature of his conduct, and his potential for rehabilitation, his sentence should be somewhere between with that of Ms. Conley and the treatment of the Somali-American and Sudanese-American teens.

In *United States v. Cordoba-Bermudez*, 4 F. Supp.3d 635 (S.D.N.Y. 2014), Juanito Cordoba–Bermudez, like Mr. Aziz, was convicted of violating section 2339B. Mr. Cordoba-Bermudez had done so by conspiring with others to provide material support or resources to the Fuerzas Armadas Revolucionarias de Colombia (FARC), an organization that the United States Secretary of State had designated as a foreign terrorist organization. Specifically, Mr. Cordoba–

Bermudez had "organized a smuggling group that delivered narcotics in exchange for supplies, which were then transported to the FARC by boat." *Id.* at 637. Mr. Cordoba–Bermudez had been "paid $4,500 in exchange for five boat trips to transport these supplies to the FARC." *Id* at 637-38. In furtherance of this operation, Mr. Cordoba–Bermudez "communicated repeatedly with a high-ranking member of the FARC, and discussed the procurement and transport of cocaine, weapons, military uniforms, and other supplies."

Mr. Cordoba-Bermudez's conduct involved cocaine and weapons trafficking for a terrorist organization and five smuggling trips. Mr. Aziz's conduct, meanwhile, was restricted to pro-ISIL postings on the Internet. Yet, if Mr. Aziz were to receive his recommended sentence, both Mr. Cordoba-Bermudez and Mr. Aziz would be required to serve the statutory maximum sentence for their violation of section 2339B. This is no different than the "[s]imple uniformity — sentencing every offender to five years" that the Sentencing Guidelines warns "destroys proportionality." USSG § 1A1.3. Ironically, because Mr. Cordoba-Bermudez was sentenced under the former fifteen-year maximum sentence for a violation of section 2339B, he would actually end up serving less time than Mr. Aziz if Mr. Aziz is sentenced under the post- June 2, 2015 maximum sentence.1:10-cr-00395-LO, Judgment (Doc. 51), at 1-2

Respectfully, sentencing Mr. Aziz under the post June 2, 2016 maximum of twenty-five years for Mr. Aziz would also threaten proportionality in light of the sentence received in *United States v. Chesser*, 1:10-cr-00395-LO (E.D. Va. 2010). Like Mr. Aziz, Mr. Chesser was convicted of communicating threats and providing material support to terrorists, as well as specifically soliciting others to threaten violence. Instead of the general re-broadcasting of hate

and violence by Mr. Aziz. *United States v. Chesser*, 1:10-cr-00395-LO, Judgment (Doc. 51), at 1

(E.D. Va. 2010).  Mr. Chesser was sentenced to five years for communicating threats and ten

years for providing material support, five years less than the maximum sentence for that offense

at the time.  *Id.* at 1-2. Mr. Chesser also received ten years for soliciting others to threaten

violence for a total of twenty-five years. *Id.*  Mr. Chesser, also like Mr. Aziz, used the Internet as

a means of support for ISIL.  However, Mr. Chesser's Internet behavior was considerably more

extensive and more sophisticated and targeted than was Mr. Aziz's. As he used him as a

diversion, and Mr. Chesser's support of ISIL, unlike Mr. Aziz's, extended to endangering his

infant son and attempting to travel to Somalia to join ISIL. On two occasions, they attempted

solicitation to commit 3 murders; he posted detailed information about the manufacturing and

use of explosives and weapons of mass destruction. Last, he solicited individuals to leave

suspicious packages in public venues. Mr. Chesser was stopped boarding a flight at Kennedy

Airport with his infant son in hand as a diversion and received a sentence of 25 years. Therefore,

if Mr. Aziz were to receive the same sentence as Mr. Chesser, those sentences would undermine

the goal of similar sentences for similar conduct.

## Vi.    Victims of a Violation of Section 875(c) Are Entitled to Restitution only If They Can Show Probable Cause, and no Such Showing Has Been Made Here.

Under 18 U.S.C. § 3663A(a)(1), "the victim" of a violation of 18 U.S.C. § 875(c) is

entitled to restitution.  Section 3663A(a)(2) defines "victim" as "a person directly and

proximately harmed as a result of the commission of an offense for which restitution may be

ordered." In *Paroline v. United States*, 134 S. Ct. 1719 (2014), a child pornography case the

Supreme Court considered identical language found in 18 U. S. C. § 2259, *id.* at 1720, and held

51

that that language required that the Government show that the defendant's action was both the

cause-in-fact and the proximate cause of an injury before restitution could be awarded for that

injury. *Id.* at 1719-22. More importantly, the victims in this case were listed in numerous

network outlets, much more far reaching that Mr. Aziz and his cell phone.

Like the defendant in *Parolene,* Mr. Aziz is not the cause-in fact of the injuries for which

restitution is sought here. Although the presentencing report does not indicate how many people

besides Mr. Aziz publicized or rebroadcast the ISIL list of military service personnel either

through the internet or mainstream media, a limited Internet search reveals that the number was

very large. Therefore, it would be just as difficult in this case as it was in *Paroline,* to show that

the claimants' "trauma and attendant losses would have been any different" but for Mr. Aziz's

offense. *Id.* at 1723. In addition, here, as in *Paroline,* there has been no showing that any of the

claimants even knew of Mr. Aziz's violation in particular because none of the seven indicated

any knowledge of Mr. Aziz's posting.

In providing further guidance for proving proximate cause, the *Parolene* Court stressed

that the significance of conduct "would not be severe" where the claimant's injuries "are the

product of the acts of thousands of offenders," *id.* at 1727, and that to treat a single actor in such

a case "as a proximate cause of all the victim's losses—especially in the absence of a workable

system of contribution—stretches the fiction of aggregate causation to its breaking point." Id. at

1729. Here, as in *Paroline*, the claimants' injuries "are the product of thousands of offenders"

so the significance of Mr. Aziz's conduct should, from the outset, not be seen as severe in its

overall impact, despite his hateful intent. In addition, that significance is further diminished

because Mr. Aziz did not create the list, he did not initially post the list, he had no name recognition, fame or notoriety in the inner or outer circles of ISIS or ISIL that could help promote the list, and the portion of the list Mr. Aziz did post was less than ten percent of the entire list.

## CONCLUSION

Counsel is respectfully requesting that this Court sentence Mr. Aziz for his conduct and for what he was endorsing, but do not sentence him for all of the post 9/11 traumas that continue today. Mr. Aziz recognizes that free speech is not necessarily free. It must be accompanied by loyalty to the country that provides him the privilege of freedom, trust, responsibility, the observance of laws, and the recognition that freedom to speak and express does not include freedom to incite or vilify, or to rationalize hate and violence in the name of religion. No legitimate religion endorses that. He now knows he must pay the prize.

Counsel is respectfully requesting, for all the reasons stated above, that the Court depart under the guidelines, and institute a variance under 3553 to base offering level 24, with a period of supervised release with special conditions, including entry to the HOPE and TAM programs, work full-time at Structures Unlimited, a real estate company in Prince George County, Maryland that has agreed to hire Mr. Aziz upon his release, a curfew of 11 p.m. and no Internet usage or any social media use. Such a sentence is reasonable and just because it is sufficient to deter similar behavior by others, is consistent with sentences given to others for similar violations, and recognizes Mr. Aziz's particular circumstances and potential for rehabilitation.

Respectfully submitted,
Jalil Ibn Ameer Aziz
By Counsel

William Fulton
Local Counsel for Bernard S. Grimm
Bar Number: 25457
106 Walnut St
Harrisburg, PA 17101
717.233.5133
bfulton138@aol.com


Bernard S. Grimm
409 7th Street, N.W. Ste 300
Washington, DC 20004
(202) 464-6333
bgrimm@grimmlawdc.com


Cc:

AUSA Daryl Bloom
U.S. Attorney's Office
P.O. Box 11754
Harrisburg, PA 17108

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the $\underline{26}$ day of $\underline{September}$ 2017, I electronically filed the

foregoing with the Clerk of Court:

> AUSA Daryl Bloom
> U.S. Attorney's Office
> 228 Walnut Street, Suite 220
> P.O. Box 11754
> Harrisburg, PA 17108

William Fulton
Bar Number: 25457
106 Walnut St
Harrisburg, PA 17101
717.233.5133
bfulton138@aol.com
Local Counsel for Bernard S. Grimm

Bernard S. Grimm
409 7th Street, N.W. Ste 300
Washington, DC 20004
(202) 464-6333
bgrimm@grimmlawdc.com