# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CR. NO. 1:15-CR-309 |
| | : | |
| v. | : | (Chief Judge Conner) |
| | : | |
| **JALIL IBN AMEER AZIZ**, | : | (electronically filed) |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

AND NOW, the United States of America, by its undersigned counsel, submits the following Sentencing Memorandum in the above-captioned case:

## I.   Statement of the Case

From June 2014 to December 2015, the defendant engaged in a concerted and prolonged effort to support the Islamic State of Iraq and al-Sham ("ISIL" or "ISIS").   ISIS is a foreign terrorist organization that has encouraged and taken credit for attacks against civilians throughout the world, including in the United States.   The defendant was steadfast and outspoken in his support for ISIS and its murderous mission.

On numerous occasions, the defendant called for attacks on the West and expressed his desire to fight for ISIS.   The defendant

communicated with ISIS recruiters, attempted to raise funds for ISIS, gave ISIS supporters advice on how to travel covertly and join the terrorist organization, and disseminated a "kill list" that exhorted ISIS supporters to murder United States service members.   The self-styled "Islamic State Hacking Division" compiled the list.   It contained the names, home addresses, and photographs of 100 United States service members.

ISIS is not a closely held, hierarchical organization.   Instead, it depends on persons such as the defendant to spread its hateful ideology, recruit fighters, and conduct attacks on civilians.   The defendant pledged allegiance to ISIS's leader and acted as a proxy within the United States for this terrorist organization.   A guideline sentence will be sufficient but not greater than necessary and will deter the defendant and others who may be tempted by ISIS's clarion call.

## II.   Background

On May 18, 2016, a Grand Jury sitting in Harrisburg, Pennsylvania returned a four-count superseding indictment.   Rec. Doc. No. 42.   Count I charged the defendant with conspiring to provide

material support and resources to ISIS, in violation of 18 U.S.C. §

2339B. *Id.* Count II charged the defendant with attempting to

provide and providing material support and resources to ISIS, also in

violation of § 2339B. *Id.* Count III charged the defendant with

solicitation to commit a crime of violence in violation of 18 U.S.C. §§ 2

and 373. *Id.* Count IV charged the defendant with transmitting a

communication containing a threat to injure in violation of 18 U.S.C. §§

2 and 875(c). *Id.* During the time-period charged in the indictment,

ISIS was designated a Foreign Terrorist Organization ("FTO") under

Section 219 of the Immigration and Nationality Act. *Id.* To this day,

ISIS remains a designated FTO.

On January 30, 2017, the defendant pled guilty to Counts I and IV

of the indictment. Rec. Doc. No. 107. Following the defendant's guilty

plea, a Presentence Report was ordered and prepared.

As set forth in the Presentence Report, ISIS is a designated FTO

that is based in Iraq and Syria. PSR ¶ 5. ISIS's stated goals are to

create and rule a caliphate, and to fight against any nations that oppose

it. ISIS has also committed atrocities against homosexuals and

religious minorities, including the Yazidi people, in areas that it
controls.   Initially, ISIS encouraged supporters from throughout the
world, including the United States, to travel to Iraq and Syria to join
and fight for the terrorist organization.   Over time, law enforcement
and intelligence agencies began to arrest ISIS supporters and prevent
them from travelling to ISIS-controlled territory.   Additionally, the
militaries of many coalition nations began killing ISIS fighters
throughout Iraq and Syria.   On or about September 21, 2014, Abu
Muhammad al-Adnani ("Adnani")—who, prior to his death, served as an
architect of ISIS's external operations and as ISIS's chief spokesman—
issued a recorded statement calling for attacks against citizens, civilian
or military, of the countries participating in the United States-led
coalition against ISIL.   PSR ¶ 2.

Since then, ISIS has continued to encourage supporters to conduct
attacks in their homelands.   PSR ¶ 4.   ISIS has claimed responsibility
for the following terrorist attacks, among others: (1) On or about May 4,
2015, two ISIS supporters attempted an attack on the American
Freedom Defense Initiative's Muhamad Art Exhibit and Cartoon

Contest in Garland, Texas; (2) On or about November 13 and 14, 2015, a group of attackers carried out multiple terrorist attacks throughout Paris, France, which killed approximately 130 people; and (3) on or about March 22, 2016, a group of attackers carried out bombings in Brussels, Belgium, which killed at least 32 people.   Plea Agmt. Stmt. of Facts ¶ 4.   In short, persons such as the defendant are critical to ISIS's efforts to bring new fighters to the so-called caliphate or conduct attacks to intimidate Westerners.

ISIS relies heavily upon social media, the Internet, and encrypted communication applications to spread its hateful message and recruit and mobilize supporters.   Plea Agmt. Stmt. of Facts ¶ 5.   Using these platforms, ISIS posts and circulates videos and updates of events in Syria, Iraq, and other ISIS-occupied areas, in English and Arabic, as well as other languages, to draw supporters to its cause.   Plea Agmt. Stmt. of Facts ¶ 5.   Members and supporters of ISIS frequently use a variety of electronic communication systems to attempt to avoid having their communications monitored by law enforcement.   Plea Agmt. Stmt. of Facts ¶ 5.

The defendant was a significant contributor to ISIS's social media efforts.   Using Twitter, he sent thousands of Tweets, retweets, and direct messages on behalf of ISIS.   He repeatedly posted photographs and videos depicting ISIS's violent acts.   *See* PSR ¶¶ 7-8 (quoting and summarizing tweets).   The defendant made a concerted effort to cultivate an audience of like-minded individuals.   Some of the defendant's most significant communications are attached as Exhibit A.[1]

The defendant also served as an important conduit between ISIS recruiters in Iraq and Syria and English-speaking recruits.   Indeed, the defendant communicated directly with at least two ISIS recruiters. One of these recruiters told the defendant, "[Two recruiters] are best for hijra [emigration to an Islamic country, in this context, to ISIS-controlled territory]/ Ppl who wanna k** peeps then me nd Abu H can help."   Ex. A at 75.   Based on this and other investigations, the phrase

---

[1] The communications in this memorandum and Exhibit A are presented verbatim from the text received from Twitter.   They have been reformatted in the exhibit to appear as they would have to someone viewing the defendant's accounts on Twitter.   All errors are original.

"k** peeps" refers to conducting attacks in the West.   In other words, this ISIS recruiter sought to put the defendant in touch with ISIS members who could facilitate travel for potential foreign fighters or plan attacks in the United States and elsewhere.

The defendant provided other ISIS supporters with contact information for these ISIS recruiters.   *See* PSR ¶¶ 10-12.   The defendant advised ISIS supporters to travel covertly and, in one instance, to wipe "pro-IS materials from his computer and not wear Muslim clothes when crossing the border."   PSR ¶¶ 9-10.

The defendant also steeled himself to fight for ISIS.   He prepared a military-style backpack, five high capacity magazines loaded with ammunition for an AR-15 or M4 variant assault rifle, a knife, fingerless gloves, and a balaclava similar to the type used by ISIS supporters to mask their identities.   Although the defendant did not have a passport at the time of his arrest, he could have used these items to commit an attack in the United States or to practice for combat with ISIS overseas.

A guideline sentence is appropriate in this case.   Although the defendant did not travel to fight for ISIS, he is a danger to society.   The

defendant contributed to ISIS's global operations and encouraged
attacks against civilians both at home and abroad.   He threatened
United States service members and shared their private information,
including their names and home addresses.   In short, the defendant did
everything in his power to support the terrorist organization.   An
extensive period of imprisonment is just punishment and necessary to
serve as a deterrent to him and others.

## III.   Applicable Legal Standards

The U.S. Supreme Court has held that the U.S. Sentencing
Guidelines are "effectively advisory."   *United States v. Booker*, 543
U.S. 220, 245 (2005).   The Supreme Court advised sentencing courts
that, even "[w]ithout the 'mandatory' provision, the [Sentencing
Reform] Act nonetheless requires judges to take account of the
Guidelines together with other sentencing goals," specifically citing
those goals listed in 18 U.S.C. § 3553(a).     *Id.* at 259; *see also United
States v. Kimbrough*, 552 U.S. 85 (2007) (stating that "the Guidelines,
formerly mandatory, now serve as one factor among several courts must
consider in determining an appropriate sentence.").   The Supreme

Court has instructed that the sentencing court should calculate the Guidelines range, permit the parties "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and pronounce a sentence taking into account all of the relevant factors. *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Once a defendant is determined guilty of the predicate elements of an offense, it is within the court's discretion to impose up to the maximum sentence authorized under the United States code. *United States v. Grier*, 475 F.3d 556, 561 (3d Cir. 2007) (en banc). Under an advisory guideline scheme, facts relevant to sentence enhancement do not need to be found beyond a reasonable doubt, thus District Courts are able to make findings for selecting a sentence and offense base level by a preponderance of the evidence. *United States v. Corley*, 455 F. App'x 178 (3d Cir. 2011) (unpublished). In the event that the sentencing court decides to impose a sentence at variance with a Guidelines calculation, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." *Gall*, 552 U.S. at 50 (noting that a

"major departure should be supported by a more significant justification than a minor one.").

## IV.   Argument

The government agrees with the findings of the United States Probation Officer in the Presentence Report.   In his letter to the Probation Officer and sentencing memorandum, the defendant raises a number of objections, asks for certain departures, and requests a variant sentence well outside of the advisory guideline range.   For the reasons discussed below, the Court should reject these arguments and sentence the defendant to a guideline sentence.

### A. The Probation Officer Correctly Calculated the Advisory Guideline Range.

In his letter and memorandum, the defendant raises a number of objections to the Probation Officer's calculation of the advisory guideline range.   None of these objections has merit.   The Court should adopt the guidelines calculations in the Presentence Report without change.

### 1. The Statutory Maximum Sentence for Count I is Twenty Years.

In his plea agreement, the defendant acknowledged that the statutory maximum penalty for a violation of 18 U.S.C. § 2339B is "imprisonment for a period of 20 years, a fine of $250,000, [and] supervision for any term of years or life, to be determined by the court." Rec. Doc. No. 105.   The Court advised the defendant of this fact at his change of plea hearing.   Rec. Doc. No. 109.   The defendant now argues that the Court should sentence the defendant under the pre-June 2, 2015 maximum sentence of 15 years.   *See* Def.'s Mem. 8-9.   The defendant cites no authority for this proposition.   Instead, he ignores his own plea agreement and cites to plea agreements the government reached in other cases.   The defendant is wrong as a matter of law and the plea agreements he relies on are easily distinguishable.   The defendant should be sentenced under the 20-year statutory maximum.

In *Carmell v. Texas*, 529 U.S. 513, 525 (2000), the Supreme Court reiterated that "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime when committed" violates the ex post facto prohibition as first articulated by

11

Justice Chase in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 389-90 (1798).   A

change in a statute can be applied to a continuing offense if the illegal

conduct continued into the period after the enactment.   *See United*

*States v. Torres*, 901 F.2d 205, 226 (2d Cir.1990), *abrogated on other*

*grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010);

*United States v. Johnson*, 537 F.2d 1170, 1175 (4th Cir. 1976).   If a

conspiracy continued after a statute's effective date "the burden shifts

to the defendant to prove by affirmative acts inconsistent with the

object of the conspiracy that he withdrew."   *United States v. Gibbs*, 813

F.2d 596, 602 (3d Cir. 1987) (citing *United States v. Ammar*, 714 F.2d

238 (3d Cir. 1983)), *abrogated on other grounds by United States v.*

*Williams*, 40 F. App'x 669 (3d Cir. 2002).   The defendant offers no

evidence, and indeed there is none, that he withdrew from the charged

conspiracy prior to passage of the USA Freedom Act.

Likewise, the defendant should not receive a downward departure

or variance because the statutory maximum increased during the

course of his conspiracy.   The Supreme Court has explained, "Critical

to relief under the *Ex Post Facto Clause* is not an individual's right to

less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver v. Graham*, 450 U.S. 24, 30 (1981).

When the USA Freedom Act passed, the defendant was at least on constructive notice of the higher statutory maximum.   In the context of a change in the Sentencing Guidelines, the Seventh Circuit has explained, "The choice is his whether to cease or persist; and if he chooses to keep going down the wrong path, the application of the new guideline and a harsher penalty cannot be said to have taken him by surprise." *United States v. Vallone*, 752 F.3d 690, 696 (7th Cir. 2014). The defendant faced such a choice and persisted in his criminal activity. For example, on July 21, 2015, he bragged about purchasing a Yazidi girl for sexual exploitation.   Ex. A at 96-97.   On August 21, 2015, the defendant encouraged ISIS supporters to join ISIS's affiliate in Libya. *Id.* at 98.

The defense argues that the lower maximum applies because the offense "predominantly took place before" June 2, 2015.   The law draws

no such distinction, however, and treats a "defendant's failure to withdraw from an ongoing conspiracy as the equivalent of active involvement in the conspiracy." *Vallone*, 752 F.3d at 696.   The defense also points out that "eighty-five percent of the pages in the Government's exhibit for trial appear to be dated prior to June 2, 2015." Needless to say, the proposed trial exhibit, which is nearly identical to Exhibit A, is not exhaustive.   Moreover, the two Tweets described above alone show that the defendant continued to participate in the conspiracy to provide material support after the higher statutory maximum took effect.

The defendant's reliance on *United States v. Topaz* is misplaced.[2] Topaz was charged with and pled guilty to a single violation of conspiracy to provide material support to ISIS, in violation of 18 U.S.C. § 2339B. *United States v. Topaz*, 2-15-cr-00450-SDW, Plea Agreement, ECF. No. 14, at 2 (D.N.J. 2015).   The complaint alleged that Topaz and

---

2  The other case the defendant cites, *United States v. Said*, is easily distinguishable.   Said was *arrested* in 2013, two years prior to enactment of the USA Freedom Act.   *See United States v. Said*, 1:13-cr-20364-UU (S.D. Fla. 2015).

three coconspirators conspired to travel overseas and provide themselves and each other as personnel to ISIS.   *See United States v. Topaz*, 2-15-mj-07189-CLW, Complaint (D.N.J. June 18, 2015).   The complaint, which was signed on June 18, 2015, alleged that the conspiracy began in or about October 2014 and continued to the date of its execution.   Nearly all of the allegations in the complaint pertain to conduct that predates the USA Freedom Act's effective date.   A foreign government arrested one of Topaz's coconspirators in May 2015, and the FBI arrested another one of Topaz's coconspirators on June 13, 2015. The FBI arrested Topaz on June 17, 2015.   Although the government stipulated that the lower maximum sentence applied, the plea agreement acknowledged that the sentencing court could apply the higher maximum.   *United States v. Topaz*, 2-15-cr-00450-SDW, Plea Agreement, ECF. No. 14, at 2 (D.N.J. 2015).

## 2.  The Terrorism Enhancement Should be Applied.

In his plea agreement, the defendant stipulated that the terrorism enhancement under U.S.S.G. § 3A1.4 applied.[3]   *See* Plea Agmt. ¶ 10 ("The parties agree that the offenses charged in Counts 1 and 4 involved and/or were intended to promote a federal crime of terrorism. Therefore, the parties agree that U.S.S.G. § 3A1.4 applies to the defendant.").   Now, he asks the court to disregard that stipulation or grant him a departure or variance that would negate the enhancement's effect.   *Compare* Addendum to PSR, Def. Ltr. ¶¶ 14-15 ("Mr. Aziz objects to the application of § 3A1.4(A) in paragraph 35 [and 43] of the presentencing report to add twelve levels because such an application violates Congress's intent in passing the Sentencing Reform Act of 1984.") *with* Def. Sent. Mem. at 1 (asking for a base offense level of 24) *and* 15-17 (asking for a variance under section 3553 for reasons of "proportionality").

The defendant offers no reason why the Court should ignore this

---

[3] Section 3A1.4 provides a 12-level increase in the offense level, with a minimum offense level floor of 32, and an increase of the criminal history category (CHC) to level VI if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism. U.S.S.G. § 3A1.4 (2016).

stipulation.   Likewise, he cites no authority for his proportionality

argument under section 3553.   This is unsurprising, because the

defendant's conduct falls squarely within the terrorism enhancement.

Section 3A1.4 requires proof of two elements: (1) the defendant

must have been convicted of an offense that involved or was intended to

promote a federal crime of terrorism; and (2) the offense must have been

"calculated to influence or affect the conduct of government by

intimidation or coercion, or to retaliate against government conduct."

U.S.S.G. § 3A1.4, app. 4.A (stating that the "federal crime of terrorism"

is defined by cross-reference to 18 U.S.C. § 2332b(g)(5)).   With respect

to the first element, the defendant was convicted of an offense listed in

18 U.S.C. § 2332(b)(g)(5) (listing § 2339B as a federal crime of

terrorism).

With respect to the second element, "the application of § 3A1.4 . . .

does not require a finding that [the defendant] was personally

motivated by a desire to influence or affect the conduct of government.

Rather, the government need only demonstrate that [the defendant]

intended to promote a crime calculated to have such an effect, . . .

17

whatever [the defendant's] reason for committing them." *United States v. Awan*, 607 F.3d 306, 315-16 (2d Cir. 2010); *see United States v. Jayyousi*, 657 F.3d 1085, 1114-15 (11th Cir. 2011) ("[T]he Guidelines's precise language focuses on the intended outcome of the defendants' unlawful acts—i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was.").

The defendant's own statements make clear that the second element is met.   The government obtained thousands of the defendant's communications.   On numerous occasions, the defendant praised ISIS's violent acts and encouraged attacks on Westerners.   The following examples are illustrative.   Exhibit A contains many more.   On August 8, 2014, the defendant direct messaged another Twitter user, "The reason I support The Islamic state is because they are the only ones fighting the enemies of Islam on 8 fronts in this war/ They are bringing back the khilafah we lost in the past 90+ years which was destroyed by France,UK,and Europe [sic]."   Ex. A at 6.   On January 8, 2015, the defendant tweeted, "#KillAllKufar #KillAllKifar #KillAllKufar

18

#KillAllKufar #KillAllKufar #KillAllKufar #KillAllKufar #KillAllKufar [The term "kufar" translates to "infidels" and is synonymous with "non-believers" in this context.]."   PSR ¶ 7c.   Through this Tweet, the defendant is calling for the killing of all non-believers.   On January 29, 2015, the defendant tweeted, "#IS 'Know O Obama, that we are coming to America and that we will sever your head in the White House."   PSR ¶ 7d.   This tweet also included a picture of a masked militant about to behead a soldier.   On June 26, 2015, the defendant Tweeted, "Kuffar are celebrating about Same sex marriage law [sic],white house [sic] is in literal rainbows ,DC [sic] in high celebration, Allah's punishment coming."   Ex. A at 92.

The defendant is not entitled to a departure or variance from the terrorism enhancement.   Because of his plea agreement, the defendant has already received some relief from it.   *See* PSR ¶¶ 68-70.   Under the indictment, the defendant faced a maximum exposure of sixty-five years and a guideline imprisonment range of 360 months to life.   His maximum exposure, and the guideline range, is now 25 years.

Moreover, courts have repeatedly emphasized that persons

19

convicted of terrorism offenses should receive lengthy sentences.   *See*

*Jayyousi*, 657 at 1117 ("Terrorists, even those with no prior criminal

behavior, are unique among criminals in the likelihood of recidivism,

the difficulty of rehabilitation, and the need for incapacitation."); *United*

*States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("Congress and the

Sentencing Commission had a rational basis for concluding that an act

of terrorism represents a particularly grave threat because of the

dangerousness of the crime and the difficulty of deterring and

rehabilitating the criminal, and thus that terrorists and their

supporters should be incapacitated for a longer period of time.").

In *United States v. Stewart*, the United States Court of Appeals

for the Second Circuit considered the sentence of Lynne Stewart for

various crimes arising from her interactions with Sheikh Ahmad Ali

Abdel Rahman.   *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).

At the time, Rahman was serving a life sentence in a maximum security

prison for terrorism-related crimes and was subject to "Special

Administrative Measures" that restricted his ability to communicate

with persons outside of the prison.   *Id.* at 109-10.   Stewart, who was

20

an attorney, helped Rahman communicate with his followers in Egypt. *Id.* at 114-16.   Stewart did not plan or undertake any acts of violence. *Id.* at 116.   Nevertheless, she was convicted of, *inter alia*, providing and concealing material support to a conspiracy to murder persons in a foreign country, in violation of 18 U.S.C. §§ 2339A and 956.   The district court sentenced Stewart to a 28–month term of incarceration to be followed by a two-year term of supervised release.   *Id.* at 144.

On appeal, the Second Circuit characterized the sentence as an "extraordinary 92 percent reduction from the recommended Guidelines range" and the term of incarceration as "unprecedented in convictions for material support of terrorism."[4]   *Id.* at 165-66.   The Second Circuit also noted that the terrorism enhancement applied as a matter of law. although the sentencing court "may differentiate between different levels of culpable conduct that nonetheless trigger the same substantial enhancement."   *Id.* at 148.

---

4 The government provides the following by way of comparison. Initially, the defendant asks to be sentenced at a range of 51-63 months. Def. Mem. at 1-2.   Later, he asks for a sentence of 78 months.   See Def. Mem. at 48.   These would constitute reductions of 83%-79% and 74%, respectively.

The defendant's conduct falls squarely within the terrorism enhancement.   The defendant cultivated a large following on social media and called for violent acts.   In coordination with ISIS recruiters, the defendant attempted to facilitate travel for other ISIS supporters and expressed his own desire to travel to the "Islamic State." Following release of the "kill list," the government had to notify all of the service men and women to warn them that they had been targeted by a terrorist organization.   As described in the Victim Impact Statements, victims purchased firearms, left their homes, and installed security systems to ensure they and their families were safe, not to mention the emotional trauma of seeing their names, photographs, and addresses on a kill list.

The defendant attempts to draw a distinction between himself and defendants who attempted to travel to join ISIS, gathered equipment for the organization, or sought to raise money on behalf of a terrorist organization.   Def. Mem. at 32-39; *see* Addendum to PSR, Def. Ltr. ¶ 17 (requesting a departure because " 'the material support provided'" and the defendant's 'planning or sophistication' are all extremely low"),

18 (requesting a variance because, *inter alia*, the guidelines "do not allow for adequate consideration of the . . . ineffectiveness of [the defendant's] actions").   This distinction is misplaced.

The defendant did everything within his power to provide this type of support that he considers to be within the enhancement. Although he did not travel to join ISIS, the defendant repeatedly advised others on how to do so.   The defendant also expressed his desire to join his coconspirators in the "Islamic State."   Although the defendant did not supply ISIS with equipment, he researched and glorified the weapons and equipment used by ISIS on the battlefield. Moreover, the defendant acquired a large quantity of assault rifle ammunition and concealed it to avoid detection.   Although a firearm was not recovered, the defendant's own statements make clear that he wanted to obtain one.   The defendant bragged, "Pennsylvania have [sic] very light gun laws its [sic] very easy to arm yourself."   Ex. A at 26.

The defendant also made efforts to raise funds for ISIS.   On April

16, 2015, he tweeted from the account @ansarlummah2BL (likely an homage to Osama Bin Laden), "Perform your Islamic duty.   Support the Jihad with your wealth. . . . SHARE . . . DM [direct message] for more info."   Ex. A at 29.   Although it does not appear that anyone direct messaged the defendant about this post, it is likely that ISIS supporters may have donated independently or shared this posting with others.

Although the defendant never traveled overseas or attempted an attack in the United States, his prolonged support of ISIS, combined with his incitement of others and preparation to engage in violence, show that he is as dangerous and culpable as those who have.   With the plea agreement, the defendant has already received substantial relief from the terrorism enhancement.   Further departure or variance from it is unwarranted.

### 3. The Enhancement for Conduct Evidencing an Intent to Carry Out the Threat Should be Applied.

Section 2A6.1(b)(1) provides for an enhancement "when the offense involved *any* conduct evidencing an intent to carry out [the] threat." U.S.S.G. § 2A6.1(b)(1) (emphasis added). The enhancement does not require proof that the defendant traveled to or sought out the victims he threatened. Courts have affirmed application of the enhancement based, for example, on the possession of items that could be used to carry out the threat. *See, e.g.*, *United States v. Ware*, 386 Fed. App'x 10 (2d Cir. 2010) (unpublished) (defendant had history of physically abusing his girlfriend, was arrested in possession of a loaded firearm and the type of bullets referenced in his threats); *United States v. Kirsh*, 54 F.3d 1062, 1073 (2d Cir. 1995) (defendant purchased firearms and attempted to purchase ammunition).

Here, the defendant possessed, among other things, a large quantity of ammunition for an AR-15 or M4 variant assault rifle; five magazines; a balaclava similar to the kind worn by ISIS members; fingerless gloves; and a knife modified with tape, which would give it a better grip. The defendant also posted images of himself and others using these or similar items. *See* Ex. A at 13, 27, and 95. This

evidence, coupled with the defendant's frequent glorification of violence

by ISIS, including against the United States, are sufficient for the court

to conclude it more likely than not that he intended to carry out the

charged threat.

The case cited by the defense, *United States v. D'Amario*, 350 F.3d

348 (3d Cir. 2003) is inapposite.   There, the defendant was already

incarcerated when he mailed the threat.   *Id.* at 352.   The defendant

did nothing else—and possessed no items that could be used—to carry

out the threat.   By contrast, this defendant armed himself, posted

images of himself with weapons, and repeatedly glorified violence.   The

enhancement should be applied.

### 4. The Defendant is Not Entitled to a Departure Under Section 5K2.0.

The process for deciding whether to depart from the guidelines is

covered by the Supreme Court's decision in *Koon v. United States*, 518

U.S. 81 (1996).   The Court explained that, "Before a departure is

permitted, certain aspects of the case must be found unusual enough for

it to fall outside the heartland of cases in the Guideline."   *Id.* at 98.

The Third Circuit has interpreted *Koon* as requiring a four-step

inquiry.

> First, we determine if the factor relied upon in the case makes it special or unusual, taking it outside the heartland. Second, we determine whether departures on such factors have been forbidden by the Commission. Third, we determine whether the Commission had encouraged departures based on such factors. Fourth, we determine whether the Commission has discouraged departures based on such factors.

*United States v. Yeaman*, 248 F.3d 223, 231 (3d Cir. 2001).

Here, the defendant argues that his age, mental and emotional condition, and lack of prior criminal history "come together" to justify a departure under Section 5K2.0(c).   Def. Mem. at 19.   Section 5K2.0(c) allows the consideration of characteristics or other circumstances, even if not ordinarily relevant to a determination of whether a departure is warranted, if such characteristics or circumstances "are present to a *substantial degree*" and if taken together make the case "*exceptional.*" U.S.S.G. § 5K2.0.   The Sentencing Commission's commentary states that departures under this provision "should occur extremely rarely." U.S.S.G. § app. note 3(c).

The Court should reject the defendant's motion for a departure. The characteristics he cites are not present to a substantial degree, and

this case is not exceptional.   Rather, the case falls squarely within the

heartland of material support offenses committed by young, internet-

savvy ISIS supporters.

The defendant's claims regarding age are covered by U.S.S.G. §

5H1.1.   Age is a discouraged factor.   The Sentencing Commission

proscribes that departures based on age should be given only in the

most extraordinary cases:

> Age (including youth) is not ordinarily relevant in
> determining whether a sentence should be outside the
> applicable guideline range. Age may be a reason to impose a
> sentence below the applicable guideline range when the
> defendant is elderly and infirm and where a form of
> punishment such as home confinement might be equally
> efficient as and less costly than incarceration.

The Third Circuit has held that a defendant who is 18 at the time of his

offense is not rendered extraordinary by his youth alone.   *See United*

*States v. Rodriguez*, 107 F. Appx. 295 (3d Cir. 2004) (unpublished);

*United States v. Shoupe,* 929 F.2d 116, 120 (3d Cir. 1991).

In *United States v. Rodriguez*, the Third Circuit rejected a

departure based on age for an 18-year old defendant.   *Rodriguez*, 107

F. Appx. at 298.   The court noted that "it is not uncommon for

eighteen-year-olds to commit narcotics-related offenses, and those wishing to import drugs using couriers in this fashion often seek young, naive men and women without extensive criminal experience." *Id.*

ISIS operates in a similar manner.   The terrorist organization's social media operation disseminates propaganda to recruit and radicalize young, and often naïve, supporters.   The cases cited by the defendant in his memorandum, as well as other recent material support prosecutions, makes this clear.   The defendant's age falls squarely within the heartland of this guideline and is far from exceptional.

The defendant also relies on alleged defects in his mental and emotional condition.   Section 5H1.3 provides, "Mental and emotional conditions may be relevant in determining whether such a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." Although this is an encouraged departure, the defendant has no history of mental or emotional problems.   PSR ¶ 61.   There is simply no evidence that the defendant has a mental or emotional defect, let alone

a defect that is present to an *unusual or substantial* degree, as required

by the Guidelines.   *Cf. United States v. Handerhan*, 739 F.3d 114, 124

(3d Cir. 2014) (affirming slightly below guideline sentence under

3553(a) factors where defendant claimed his possession of thousands of

images of child pornography was driven by his obsessive compulsive

disorder combined with "internet addiction").

Because the defendant has no serious mental or emotional defects,

he appears to be arguing for a departure based on his upbringing.   *See*

Def. Mem. 20 ("[H]e was a seventeen-year-old living in complete

isolation with is parents.").   The defendant provided no information

regarding his home situation to the Probation Officer.   Assuming

counsel's and the defendant's brother's and sister's characterization of

his upbringing are even true, this type of departure is explicitly

foreclosed by the Sentencing Guidelines.   *See* U.S.S.G. § 5H1.12 ("Lack

of guidance as a youth and similar circumstances indicating a

disadvantaged upbringing are not relevant grounds for imposing a

sentence outside the applicable guideline range.").   In *United States v.*

*Withers,* 100 F.3d 1142 (4th Cir. 1996), *cert. denied*, 520 U.S. 1132, 117

S.Ct. 1282, 137 L. Ed. 2d 358 (1997), the Fourth Circuit cautioned courts not to "create incentives for defendants to comb their personal circumstances in order to find evidence of hardship or misfortune." *See also Pullen*, 89 F.3d 368, 371(7th Cir. 1996) ("miserable family history" is not permissible basis for departure in average case).

Even if the defendant is young, immature, and uneducated, none of the factors he cites is present in the case to a *significant degree*. Departure based on a combination of these factors, therefore, is unwarranted.   Given ISIS's use of the internet to recruit and radicalize, cases like this one are increasingly common.   The defendant's characteristics and conduct are squarely within the heartland of the guidelines.

## V.   Section 3553(a) Factors.

An examination of the statutory factors under section 3553(a) shows that a guideline sentence is appropriate.   The defendant's effort to support ISIS and undermine U.S. national security was sustained and egregious.   The defendant's isolation and lack of formal education weigh in favor of, not against, a significant sentence.   ISIS and other

terrorist organizations appeal to the defendant and others like him through violent imagery and messages of empowerment.   It will likely be years, if ever, before the defendant fully renounces the hatred he espoused.   A lengthy sentence is just, appropriate, and necessary to deter the defendant and others who are similarly situated.

## A.     Nature and Circumstances of the Offense.

The nature and circumstances of the offenses clearly call for a guidelines sentence.   The defendant's conduct aided a significant foreign terrorist organization and undermined American national security.   He acted over the course of 18 months, and his posts were viewed throughout the world.   He repeatedly glorified violence, facilitated travel for potential ISIS fighters, and encouraged ISIS supporters to commit terrorist attacks.   The defendant sought to strike fear in the hearts of innocent persons, including the family of U.S. service members.

The defendant did not act in a vacuum.   His conduct was part of a larger movement to grow support for ISIS in the United States and abroad.   The Court has received and reviewed several victim impact

statements describing in detail the profound and lasting impact the
defendant's conduct has had on the victims and their families.
Innocent people who happen to now live at the addresses named in the
threats are now also at risk, even if they never served in the military.
The defendant's conduct was severe, and his support for ISIS cannot be
understated.

### B.    History and Characteristics of the Defendant

The Presentence Report notes that the defendant has no history of
mental or emotional problems.   PSR ¶ 61.   The evidence shows that
the defendant was fully aware, indeed proud, of his conduct.
Therefore, a guideline sentence is appropriate.

The defendant appreciated the wrongfulness of his conduct.   As
described above, on August 8, 2014, an ISIS recruiter explicitly
identified the ISIS recruiters the defendant should contact if he wanted
to facilitate travel for ISIS supporters or plan terrorist attacks.   Ex. A
at 79.   When the defendant's social media accounts were suspended, he
repeatedly bragged about being able to open new accounts, which he did
on at least 74 occasions.   On July 11, 2015, the defendant posted an

image of himself, wearing black fingerless gloves and a red face-covering.   Ex. A at 95.   Superimposed on the image were the words, "I'M BACK KUFFAR [non-believers]."   *Id.*

The defendant believed that his communications might be monitored and attempted to avoid detection by law enforcement or intelligence agencies.   On August 10, 2014, the defendant messaged another Twitter user, "The red dress is too tight and sorry as a support of the Islamic State I won't show my face as fears of CIA or FBI thank you."   Ex. A at 8.   After the FBI arrested Ali Amin, whose case is discussed below, the defendant changed his Twitter account username and claimed to be acting as an "Islamic Analyst."   *See* Ex. A at 98 ("I'm not a terrorist just here for the news around the middle East, Islamic Analyst, not affiliated with IS or Al Qaeda.").   However, the defendant did not change his behavior or disavow his previous views.   Instead, he continued to encourage others to fight for the Islamic State.   *See, e.g.*, *id.* ("[Retweet]: The IS in Libya is in need of human resources,ifyou [sic] want to do Hijra then go to Libya! Contactthese [sic] brothers [two Twitter accounts redacted].").

The defendant couches his crime as the result of "Internet fantasies." Def. Sent. Memo at 21. The communications summarized above show that the defendant understood that his actions had real consequences. In the context of sexual offenses, courts have repeatedly rejected arguments that defendant posed no danger to the public because they were simply engaging in fantasies. For example, in *United States v. Fogle*, 825 F.3d 354 (7th Cir. 2016), the Seventh Circuit upheld an above-guidelines sentence for traveling to engage in illicit sex with a minor. The court rejected the defendant's argument that his sentence was enhanced based on "things he didn't do or for fantasies he may have had," noting that the defendant made persistent attempts to find minors to have sex. *Id.* at 357-58.

In his memorandum, the defendant claims that his parents, particularly his mother, drove him to ISIS. The defendant did not disclose this information to the Probation Officer, however, and it is not reflected in the Presentence Report. The FBI conducted extended surveillance of the defendant and his home and saw no signs of abuse. Following his arrest, the defendant's parents told law enforcement that

they had warned the defendant that he should not communicate with persons overseas and that he could be arrested because of his activity on Twitter.   *See* Exs. B and C.   For a period of time, the defendant's parents took his cellular telephone in an effort to thwart his conduct. It appears that the defendant could not resist ISIS's message and the adulation of his Twitter followers.   For these reasons alone, a significant sentence is appropriate to protect the public from the defendant.

Even if the Court is to credit the defendant's allegations of abuse and neglect, a significant sentence is nevertheless appropriate.   In *United States v. Maier*, 646 F.3d 1148 (9th Cir. 2011), the Ninth Circuit reviewed a child pornography sentence for substantive reasonableness. The district court noted that the defendant had suffered physical and emotional abuse as a child and had "very serious mental issues regarding his self-esteem, [and] depression."   *Id.* at 1153.   The district court also noted other mitigation factors such as the defendant's young age, lack of prior criminal history, as well as family ties and support. *Id.*   Nevertheless, the district court noted that many child

36

pornographers present similar mitigation factors, and that the specific circumstances of the offense outweighed those factors. *Id.* at 1156. Among others, the district court noted that the defendant distributed and received an extremely large number of images; some of the images were sadistic and violent; and the defendant expressed his desire to have a daughter to molest, "regardless of whether this desire had an element of fantasy"; and other comments the defendant made online in which he expressed a desire to abuse children. *Id.* at 1156-57. The Ninth Circuit affirmed. *See id.* at 1157.

Similar considerations apply here. The egregious, prolonged nature of the defendant's support for ISIS outweighs any mitigation evidence he might present. The defendant repeatedly glorified violence and sought to incite attacks, coordinated with ISIS recruiters, facilitated travel for ISIS supporters, and expressed his desire to join and fight for ISIS. A significant sentence of incarceration and supervision is appropriate.

## C.    Avoiding an Unwarranted Disparity

Throughout his memorandum, the defendant compares himself to

other defendants.   He argues that a substantial variance is necessary to avoid unwarranted sentencing disparities.   The defendant's list of cases is clearly not exhaustive.   He fails to mention several recent terrorism cases in which defendants received lengthy sentences.   *See, e.g.*, *United States v. Sullivan*, 1:16-cr-0005-MR-DLH, ECF No. 69 (W.D.N.C. June 27, 2017) (life sentence for attempting to commit an act of terrorism transcending national boundaries, in support of ISIS); *United States v. Kareem*, 2:15-cr-00707-SRB, ECF No. 489 (D. Ariz. Feb. 17, 2017) (thirty-year sentence for conspiracy to provide material support to ISIS, in violation of § 2339B, and related offenses); *United States v. Ferizi*, 16-cr-0042-LMB, ECF No. 66 (E.D.V.A. Sep. 23, 2016) (20-year sentence for providing material support to ISIS, in violation of § 2339B, and accessing a protected computer without authorization and obtaining information in order to provide material support to ISIS); *United States v. Alla Saadeh*, 15-cr-0558-SDW, ECF No. 24 (D.N.J. May 10, 2016) (15-year, maximum sentence for providing material support to ISIS, in violation of § 2339B.   Defendant conspired with Topaz, see *supra*, was arrested in June 2015, and was sentenced under pre-USA

Freedom Act statutory maximum).

Most conspicuously, the defendant omitted the case of Terrence McNeil, who was recently sentenced to 20 years of imprisonment for disseminating the same "kill list" that the defendant retweeted.   These cases, and others, show that a substantial sentence is warranted.

The Third Circuit has noted that section 355(a)(6) exists to ensure uniformity across judges and districts.   *See United States v. Seligsohn*, 981 F.2d 1418, 1428 (3d Cir. 1992); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("[T]he kind of 'disparity' with which § 3553(a)(6) is concerned is an unjustified difference across judges (or districts) rather than among defendants to a single case").   The Third Circuit has "made clear that disparate sentences are reasonable where facts on the record justify the disparity."   *United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006); *see United States v. Davis*, 437 F.3d 989, 997 (10th Cir.2006) ("While similar offenders engaged in similar conduct should be sentenced equivalently, disparate sentences are allowed where the disparity is explicable by the facts on the record.").

The defendants most similarly situated to the defendant are

Terrence McNeil and Ali Amin.    Both of these cases show that the defendant should receive a guidelines sentence.

McNeil pled guilty to multiple counts of solicitation to commit murder of officers and employees of the United States, in violation of 18 U.S.C. § 1114; and making a threatening interstate communication, in violation of 18 U.S.C. § 875(c).    *See United States v. McNeil*, 15-cr-0446-DAP, ECF No. 90 (N.D. Ohio April 18, 2017).    According to the government's sentencing memorandum, from May 2014 to October 2015, McNeil maintained social media accounts on several websites, including Facebook, Twitter, and Tumblr.    *McNeil*, ECF No. 96 at 1. On September 24, 2015, McNeil posted a file on his Tumblr account that displayed a GIF (looped) version of the same kill list that the defendant retweeted.    *McNeil*, ECF No. 96 at 3.    McNeil also released publically available information about the name and home address of a person whom he claimed was the Navy Seal that killed Osama Bin Laden.    *McNeil*, ECF No. 96 at 4.

McNeil pled guilty pursuant to a Rule 11(c) plea agreement that called for an agreed-upon sentence of between 15 and 20 years.

*McNeil*, ECF No. 96 at 1.   McNeil was between 21 and 22 years-old when he committed these offenses.   Like this defendant, McNeil did not attempt to travel overseas or conduct an attack in the United States.   Notwithstanding that McNeil posted the kill list months after it was already in the public domain, on August 2, 2017, the district court sentenced him to 20 years of imprisonment and a lifetime of supervised release.   *McNeil*, ECF No. 98.

Ali Amin pled guilty to a single count criminal information that charged him with providing material support to ISIS, in violation of 18 U.S.C. § 2339B.   *See United States v. Amin*, 1-15-cr-0164-CMH, ECF No. 6 (E.D. Va. June 11, 2015).   According to the factual basis for his plea agreement, Amin used the Twitter account @AmreekiWitness "to conduct Twitter-based conversations regarding ways to develop financial support for ISIL . . . and ways to establish a secure donation system or fund for ISIL."   *Amin*, ECF No. 7 ¶ 5.   Amin also operated a web page and blog that proselytized for ISIS and advised ISIS supporters on operational security.   *Amin*, ECF No. 7 ¶¶ 7-8.   Amin also radicalized a local friend and facilitated his travel to ISIS-

controlled territory.   *Amin*, ECF No. 7 ¶¶ 9-19.   Among other things, Amin put the friend in touch with an ISIS supporter, who was outside of the United States, on an encrypted communications application.

Amin was between 16 and 17 years old when he committed the offense.   On August 28, 2015, the court sentenced Amin to 136 months of imprisonment and a lifetime of supervised release.   The applicable statutory maximum for § 2339B was 15 years.   The court departed downward approximately 25% from the guideline sentence.   *Unlike this defendant*, however, Amin cooperated extensively with investigators.   In fact, when interviewed by the case agent in this case, Amin "described the 'Colonel Shaami' accounts as being aggressive in their posting of ISIL related material."   *See* Ex. D.   For these reasons, a guidelines sentence is necessary to avoid unwarranted disparities.

## VI.   Restitution

A number of victims in this case have submitted requests for

restitution for costs they incurred after the defendant posted the kill list.   The defendant posted this kill list within hours of when it was released by the "Islamic State Hacking Division."   Several of the victims incurred reasonable home security expenses to mitigate an apparent risk of harm proximately caused by the defendant's crime. The Court should order restitution for these expenses.

### A. Factual Background

The defendant was one of the first persons to circulate the kill list compiled by the Islamic State Hacking Division.     He did so within hours of when it first appeared on the internet.   The defendant distributed the names, addresses, and identifying information of military service members, at a minimum, in an effort to cause them fear.   By including the hastag #Baqiyah,, the defendant made it easy for his followers to find the posting.   PSR ¶ 20.   The defendant gleefully exulted, "Yep them US guys are pretty F**ked" and added a hyperlink to a screen shot of the list's cover sheet.   *Id.*   Approximately three hours later, the defendant retweeted a tweet from the Twitter account @Media_Shami.   The retweeted tweet read, "Identities of

Military personnel that bombed Muslims.   Find them, Kill them!"   *Id.* ¶ 21.

As a result of the defendant's dissemination of ISIS's kill list, many victims took additional security measures to ensure the safety of their families.   Several victims installed security systems or moved from their homes altogether to prevent against attacks from ISIS supporters.   The government seeks restitution for the following expenses:

| Security Systems and Monitoring | $ 6,635.79 | PSR at 20, 21, 26 |
| --- | --- | --- |

## B. Legal Standard

"The primary goal of restitution is remedial or compensatory." *United States v. Paroline*, 134 S. Ct. 1710, 1726 (2014).   Restitution also serves another important function – "impress[ing] upon offenders that their conduct produces concrete and devastating harms for real, identifiable victims."   *Id.* at 1727.   Issues related to restitution "shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the

44

Government."   18 U.S.C. § 3664(e).

"[T]he court shall order restitution to each victim in the full

amount of each victim's losses as determined by the court and without

consideration of the economic circumstances of the defendant."   18

U.S.C. § 3664(f)(1)(A).   For purposes of restitution, a victim is "a person

directly and proximately harmed as a result of the commission of an

offense for which restitution may be ordered."   18 U.S.C. § 3663A(a)(2).

In offenses involving damage to or loss of the victim's property,

the court shall require that the defendant return the property.   18

U.S.C. § 3663A(b)(1)(A).   If return is impossible, the defendant shall

"pay 'an amount equal to the greater of the value of the property on the

date of the damage, loss, or destruction; or the value of the property on

the date of the sentencing, less the value (as of the date the property is

returned) of any part of the property that is returned.' "   *United States*

*v. Simmonds*, 235 F.3d 826, 830 (3d Cir. 2000) (quoting 18 U.S.C. §

3663A(b)(1)(B)).   The Third Circuit has explained that restitution is

limited to "an amount pegged to the *actual* losses suffered by the

victims of the defendant's criminal conduct . . . and based upon *losses*

*directly resulting from such conduct.*"   *United States v. Quillen*, 335 F.3d 219, 22 (3d Cir. 2003) (citation omitted) (emphasis original).

Apportionment of restitution is discretionary.   Section 3664(h) provides that if "more than 1 defendant has contributed to the loss of a victim, the court . . . *may* apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."

### C. Argument

The defendant appears to concede that the victims are eligible for restitution under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A.   *See* Def. Mem. at 51 ("Victims of a Violation of Section 875(c) Are Entitled to Restitution Only If they Can Show Probable [Proximate] Cause. . . ."").   He argues, however, that the government cannot establish the requisite causal nexus.   The Court should reject this argument.

The Third Circuit has previously held that threat victims may receive restitution for expenses paid to render their property safe, even if the defendant did not actually damage their property.   In *United*

46

*States v. Quillen*, 335 F.3d 219 (3d Cir. 2003), the defendant mailed a
state parole board a threatening letter that contained a white powder
substance.   *Id.* at 219.  As it turned out, the substance the defendant
sent was harmless and did not contaminate the parole board.   *Id.* at
222.   He pled guilty to mailing a threatening communication, in
violation of 18 U.S.C. § 876.   *Id.* at 221.   The government sought and
the district court ordered restitution for, *inter alia*, $4,026.55 in hazmat
clean-up costs and $122.00 to reimburse damaged personal property.
*Id.* at 221.

The Third Circuit upheld the award of restitution.   It noted that
the district court's "only practical option was to order Quillen to pay the
cost of ensuring that the mail room was in the same condition as just
prior to the time it became unusable."   *Id.* at 222.   The Third Circuit
also noted that other circuits have upheld awards of repair costs.   *Id.*
at 223-24.   *See also United States v. Overholt*, 307 F.3d 1231, 1235-36
(10th Cir. 2002) (affirming award of restitution to the Coast Guard for
the costs of cleaning up a property, even though the Coast Guard's
losses were solely economic).

47

*Quillen* is analogous to this case.   The defendant damaged the service members' property.   By reposting the kill list, he rendered their homes unsafe.   The victims undertook reasonable remedial measures to ensure that their homes were secure.   The only way to make the victims whole is to award them these costs.

The defendant is also liable under the alternative theory of causation suggested by the Supreme Court in a recent child pornography case.   *See Paroline v. United States*, 134 S. Ct. 1710 (2014).   This case, which the defendant also cites in his memorandum, weighs in favor of an order of full restitution.

In *Paroline*, the Supreme Court considered the extent to which a defendant who possessed, but did not produce, child pornography of the victim was responsible for her losses.   The Court held that restitution may only be ordered to the extent the defendant's offense proximately caused the victim's losses.   *See id.* at 1727.   The Court then held that in cases where a defendant's actions are not clearly traceable to the victim's harm, courts should use an alternative causal standard.   *Id.*

The alternative causal standard has been called an "aggregate causation theory."   *Id.* at 1723.

The Supreme Court advised sentencing courts to "order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses."   *Id.*   The Court acknowledged that this causal calculation leaves open the question of how to determine the loss amount.   *Id.* at 1727. Acknowledging that "it is neither necessary nor appropriate to prescribe a precise algorithm for determining the proper restitution amount," the Supreme Court did provide some guidance in how a district court should determine restitution.   *Id.* at 1728.   As such, the Supreme Court suggested that district courts determine "the amount of victim's losses caused by the continuing traffic in the victim's images." *Id.* Then, the court should "set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses."   *Id.*   The Supreme Court listed several factors to serve as guidelines in determining this amount. They include:

- the number of past criminal defendants found to have contributed to the victim's general losses;

- reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses;

- any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted);

- whether the defendant reproduced or distributed images of the victim;

- whether the defendant had any connection to the initial production of the images;

- how many images of the victim the defendant possessed;

- any other facts relevant to the defendant's relative causal role.

*Id.* The Court further noted that the government "could also inform district courts of restitution sought and ordered in other cases." *Id.* at 1729.

Here, the *Paroline* standards for causation are met. By distributing the names, photographs, and identifying information, the defendant was "part of the overall phenomenon that caused [the victims'] general losses." *Paroline*, 134 S. Ct. at 1726. Reproducing or

distributing information in this case is akin to reproduction of child abuse images, as both play a part in causing harm to the victim in addition to the creation of the content itself.   *Id.* at 1725.   Although the defendant was not the sole cause of the victims' harms, the defendant was a cause-in-fact of them.   Moreover, the victims' are seeking restitution for costs that were a direct and foreseeable result of the defendant's distribution of their home addresses in the ISIS kill list.

Presently, there are four other defendants charged with disseminating or posting this particular hit list.   Two of those defendants, Terrence McNeil and Ardit Ferizi, have been prosecuted and sentenced.   McNeil was ordered to pay restitution but only for costs incurred after he disseminated the list.   McNeil posted the list in September 2015, some six months after the defendant posted the list. Ferizi was not ordered to make restitution.

Consideration of the remaining factors weighs in favor of an order of full restitution.   The defendant was among the very first ISIS supporters to disseminate the kill list.   These victims indisputably suffered, and continue to do so, from the threat of an ISIS supporter

attacking them and their families in their homes.   Because it is unclear

whether the future defendants will be convicted, ordered, and able to

pay restitution, the potential for them to contribute should not result in

a decrease from the total amount.   As is the case with child

pornography, distribution creates significant harm to the victims, and

the act itself all but guarantees that other ISIS supporters will view

their addresses and possibly even target them.   *See Paroline*, 134 S.

Ct. at 1728.   Over time, the court may consider other factors in

reducing this amount, including future orders of restitution.

## VII.   Conclusion

For the foregoing reasons, the United States submits that the

Court should reject the defendant's arguments, adopt the

recommendations in the Presentence Report without change, and

sentence the defendant to a guideline sentence, a lifetime of supervised

release, and award the victims for costs they incurred to render their

homes safe.

Respectfully submitted,

BRUCE D. BRANDLER
United States Attorney

Dated:   October 11, 2017          BY:

       /s/ Daryl F. Bloom
DARYL F. BLOOM
Assistant United States Attorney
PA 73820


228 Walnut Street, P.O. Box 11754
Harrisburg, Pennsylvania 17108
717/221-4482 (Office)
717/221-2246 (Fax)
Daryl.Bloom@usdoj.gov

       /s/ Robert Sander
ROBERT J. SANDER
Trial Attorney
PA 82116

U.S. Department of Justice
National Security Division
Counterterrorism Section
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
202/307-1102 (Office)
Robert.Sander@usdoj.gov

       /s/ Adam Small
ADAM L. SMALL
Trial Attorney

U.S. Department of Justice
National Security Division
Counterterrorism Section

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
202/616-2431 (Office)
Adam.Small@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CR. NO. 1:15-CR-309 |
| | : | |
| v. | : | (Chief Judge Conner) |
| | : | |
| **JALIL IBN AMEER AZIZ**, | : | (electronically filed) |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee of the United States Department of Justice and is a person of such age and discretion as to be competent to serve papers.   That on this Wednesday, October 11, 2017, he served a copy of the attached

## SENTENCING MEMORANDUM

by electronic means sent to the Defendant's attorney at the following address:

Addressee:
Bernard Grimm, Esq.
bgrimm@grimmlawdc.com

William J. Fulton, Esq.
bfulton138@aol.com


        /s/ Adam Small
        ADAM L. SMALL
        Trial Attorney

U.S. Department of Justice